HEATHER COLLIER *et al.*, Plaintiffs-Appellees, v. AVIS RENT A CAR SYSTEM, INC., *et al.*, Defendants-Appellants.

First District (3rd Division)   Nos. 1—92—0220, 1—92—0221 cons.

Opinion filed June 23, 1993.

D. Kendall Griffith and Bruce L. Carmen, both of Hinshaw & Culbertson, of Chicago, for appellant Avis Rent A Car System, Inc.

Raymond Roffi, of Chicago, for appellant Joseph Murray.

Joseph R. Curcio, Ltd., and David A. Novoselsky & Associates, both of Chicago (David A. Novoselsky and Linda A. Bryceland, of counsel), for appellees.

PRESIDING JUSTICE TULLY delivered the opinion of the court:

This cause of action arises out of an automobile collision that occurred on April 20, 1986, between plaintiff Gary Collier's (Gary's) vehicle and an automobile owned by defendant Avis Rent A Car System, Inc. (Avis), that was being driven by Avis' employee, defendant Joseph Murray. Gary had two passengers in the car with him that day: in the front seat was his wife, plaintiff Heather Collier (Heather), and in the

back seat was his daughter, plaintiff Elizabeth Collier (Elizabeth). Subsequent to the accident, plaintiffs filed suit against Murray and Avis to recover damages for injuries they sustained as a result of the incident. It is only Heather's injuries that are the subject of the instant appeals.

After a jury trial, the trial court entered judgment in favor of Heather and against Murray and Avis for $1,495,755 on November 22, 1991, *nunc pro tunc* October 25, 1991. On December 10, 1991, the trial court denied the individual post-trial motions of both Avis and Murray. It is from the judgment and the order of December 10, 1991, that defendants appealed separately to this court pursuant to Supreme Court Rule 301. (134 Ill. 2d R. 301.) Subsequently, this court consolidated defendants' appeals.

FACTUAL BACKGROUND

Avis is an automobile rental agency, operating through numerous facilities. In April of 1986, Murray was employed by Avis in the capacity of a shuttler for its facility located at O'Hare International Airport in Chicago, Illinois. A shuttler is an employee who drives cars from one Avis facility to another. Avis shuttlers are hourly employees who typically work two to three days per week. Every time a shuttler moves an Avis vehicle, it is done so on the basis of a nonrevenue or vehicle transfer contract. Accordingly, a lengthy document indicating the vehicle being moved, the vehicle's mileage, and where the vehicle is being taken to and from is prepared.

Avis had a policy known as a "dead-head" procedure available to employees in good standing. Under this policy, if a shuttler's home facility had a car belonging to another Avis facility, and that other facility had a car belonging to the home facility, a shuttler could obtain permission to move the cars between the two facilities and have use of the home facility's vehicle for his or her own use on the return trip.

When Murray was hired by Avis, he was given a set of rules and regulations involving shuttlers and the moving of Avis vehicles. Avis company policy and procedures required that when one of its cars was involved in a collision, an accident report be prepared. The report was then to be reviewed for completeness and signed by an Avis manager. In April of 1986, Carol Forsyth was employed as a distribution manager for Avis at O'Hare; one of her duties as manager was to supervise shuttlers, including Murray.

On April 17, 1986, Murray noticed that the O'Hare facility had in its parking lot a car belonging to an Avis facility in Moline, Illinois.

Murray asked Forsyth if there was an O'Hare vehicle in Moline. Forsyth checked a computer report which showed that the Moline facility had an O'Hare car. According to Murray, he asked Forsyth if he could have use of the O'Hare car he would obtain in Moline after dead-heading the Moline car to that facility. Forsyth stated that Murray had said that he wished to go to Moline to visit a friend. Subsequently, a nonrevenue transfer was executed which indicated that the return date on the transfer from Moline to O'Hare as April 18, 1986, at 11 p.m.

In the early afternoon of April 18, 1986, Murray picked up the O'Hare vehicle from the Moline facility and went to a brother-in-law's home in Hanover Park, Illinois. Murray used the car on April 18 and 19, 1986.

By the early afternoon of April 20, 1986, Murray had consumed seven to eight beers. At trial, Murray said that he received a telephone call informing him that his brother in Dolton, Illinois, suffered a heart attack and, consequently, he left to visit him.

In Hanover Park, Murray drove east on Lake Street towards Interstate 290. Murray estimated that he was traveling at 30 to 35 miles per hour as he neared Gary Avenue, which runs perpendicular to Lake Street. At that time, Gary, Heather and Elizabeth were in their stopped car at the intersection of Gary Avenue and Lake Street. Murray estimated that as he approached the Colliers' car he was between 20 to 35 feet from the rear of the Collier car when he applied the brakes before hitting it in the rear.

Officer Mark Walford of the Hanover Park police department was the first officer to arrive at the scene. Walford had been a police officer for 10½ years, and while not specifically trained at estimating speed from the amount of damage to vehicles, he had been trained and experienced in the observation of the extent of damage to vehicles and has seen collisions at varying speeds. In Walford's opinion, Murray's vehicle was going approximately 35 miles per hour at the time of impact.

Subsequently, Deputy Sheriff Marshall Norby of the Du Page County sheriff's department arrived and took charge of the investigation. Norby testified that after surveying the situation and speaking to the other officers present at the scene, he approached Murray, who was still in the Avis vehicle, and explained that the car would have to be towed due to the extensive damage it incurred. According to Norby, Murray responded that he worked for Avis, that the car was owned by Avis, and that he was taking it back to the O'Hare facility. Murray stated that he could not recall his conversation with Norby.

While speaking to Norby about ordering a tow truck, Norby smelled the odor of alcohol coming from the car's window. Murray's speech was slurred and he mumbled. When the tow truck arrived, Norby got Murray out of the vehicle and directed him towards a squad car. At that time, Norby noticed that Murray's gait was unstable. Consequently, Norby concluded that Murray was intoxicated and transported him to the Bloomingdale police department.

At the police station, Murray refused to take a breathalyzer test, balance and walking tests, or answer questions for the interview portion of the alcohol influence report form. Norby asked Murray what his occupation was, to which Murray answered that he was a shuttler for Avis. When asked by Norby when the last time he worked, Murray responded, "right now." Murray never indicated to Norby that he was headed out to Dolton to visit a brother that he believed had had a heart attack.

On the morning of April 21, 1986, Forsyth received a telephone call from Murray from the Du Page County jail. Forsyth testified that Murray told her that while driving the O'Hare car he had been in a collision, received a traffic citation, and that the car had been towed. Forsyth explained that at the time it was Avis policy to take a report whenever an employee got into an accident. Thus, she took down the information provided by Murray over the telephone and entered it onto an Avis accident report form. On the line that stated for whom and what purpose the vehicle was being used at the time the accident occurred, Forsyth wrote "dead-heading" from Moline to O'Hare "own time." Later that day, Forsyth had Murray sign the form.

Murray was suspended from Avis pending the outcome of the criminal charges against him for driving under the influence of alcohol. Subsequently, Murray appeared in court and pled guilty to the charge. Consequently, Murray was discharged on June 15, 1986.

Murray testified that it was his intention, immediately prior to the collision, to go over to Interstate 290. If Murray were to have taken Interstate 290 going north it would have taken him to O'Hare, where he was to have dropped off the Avis vehicle. Nevertheless, at trial Murray asserted that he was going to Dolton to see his brother who he thought had suffered a heart attack.

However, at trial plaintiffs introduced evidence that Murray's brother had not been hospitalized on the date of the collision. Plaintiffs further introduced evidence to show that Murray's brother had worked at his job from April 21, 1986, through April 26, 1986, the date of his heart attack and subsequent death.

Murray testified that it was his understanding that while he was driving an Avis vehicle from one locale to another, regardless of whether being paid for the trip, he was still in Avis' employ as he was moving its car. Moreover, Murray stated that it was his understanding that the use of an automobile itself was a form of pay. Furthermore, in its answer to plaintiffs' original complaint, Avis admitted agency. Subsequently, in amended pleadings, Avis denied this allegation of plaintiffs.

Heather was transported by ambulance to Glendale Community Heights Hospital after the collision. At the hospital, Heather complained of pain in her head, neck, and upper right shoulder. X rays were taken of Heather's spine. She was advised to apply ice, given a prescription and sent home.

Heather's physical condition did not improve. Dr. Matias Castro, a board-certified neurosurgeon and board-eligible neurologist, examined Heather on April 26, 1986. Castro noted that Heather had been in an accident in which she was rear-ended without suffering a loss of consciousness. Castro's examination of Heather showed that since the accident she had severe radicular pain and paresthesia on her left side. Specifically, she was complaining of a severe, sharp pain shooting down her left arm. Additionally, she suffered decreased strength of the left deltoid resulting in difficulty in elevating her left arm above shoulder level. Castro's examination also indicated that there was pressure to Heather's fifth cervical nerve route.

After completing X rays, a CT scan and a cervical myelogram, Castro concluded that Heather had a benign tumor at the level of the fourth and fifth vertebrae on the left side. It was Castro's opinion that this condition could have existed for several years without incident had there not been an external force at work. Subsequently, Castro operated on Heather and found a neurofibroma or dumbbell-shaped tumor. One part of this tumor was inside of the cover of the spinal cord and the other part was outside of it. Castro concluded that the neurofibroma had been in existence prior to the advent of the collision, but that it was during the accident that there was a flexion and extension of the neck that resulted in bleeding in the outside part of the tumor. Additionally, Castro's opinion that the accident caused the hemorrhage in the neurofibroma was buttressed by the fact that while operating on the tumor it burst, indicating that it was under pressure. Furthermore, the blood which came out of the tumor was a week or two old. Thus, Castro formed the belief that the blood in the tumor was the primary cause of Heather's medical problems. Following the operation, Castro expected that Heather would not suffer any addi-

tional threat of spinal cord compression. However, he did feel that an unstable condition might develop between Heather's fourth and fifth vertebrae.

On January 20, 1987, Castro noticed angulation of the vertebrae at C5 to C6, which he believed was caused by the injuries Heather sustained during the accident. While Castro believed that Heather might have developed angulation or instability at the C4 to C5 level as a result of the surgery to remove the tumor, he did not expect a problem at the level of C5 to C6.

Subsequently, Heather's condition became worse. There was an increase in the progression of the angulation indicating increased instability in the area. Noting that prior to the accident Heather had no complaints of any symptoms related to the neurofibroma, Castro opined that the ligaments at C5 and C6 had been stretched beyond their normal boundaries by the accident. Consequently, on May 25, 1987, Castro performed an anterior-cervical fusion on Heather's spine to correct the situation and prevent worsening of the condition.

Dr. Toras Kochno, a physician specializing in physical rehabilitation, began treating Heather on July 10, 1989. At that time, Heather complained of pain at the base of her neck accompanied by headaches, and pain in her lower back and buttocks which radiated down her legs. Kochno opined that Heather's problems with her cervical spine, lumbar spine, buttocks, sacroiliac joints, shoulders and trapezial were all a direct result of the accident and that the scarring that occurred from the neuroma was the least contributing factor to the pain that Heather was then experiencing and shall continue to experience for the rest of her life.

Today, Heather's ability to do household chores and be gainfully employed is severely reduced as a result of her health problems.

Dr. Hilliard Slavick, a physician board-certified in adult neurology, testified as an expert witness on behalf of Heather. Slavick noted that Heather was totally asymptomatic before the accident which indicated to him that the neurofibroma was not exerting any pressure on the spinal cord itself. It was Slavick's opinion that the tumor or its blood supply could be traumatized by an accident such as the one suffered by Heather. Thus, according to Slavick, Heather may never have needed to have surgery were it not for the accident. Slavick further noted that many individuals live their entire lives with the type of lesion that Heather had without developing symptoms or the need for surgery. Slavick further testified that following the first surgery, instability of the cervical spine could have been a result of the first surgery or the accident, at which time Heather could have suffered a

flexion extension injury at the cervical spine which caused stretching of the ligaments that hold the bony structures in place.

Dr. Auplay Loughran, a board-certified orthopedic surgeon, testified as an expert witness on behalf of Avis. Loughran stated that he believed that the reason for the first surgery was the neurofibroma itself. Loughran further testified that the sole cause of the instability and angulation necessitating the second operation was the bone erosion caused by the neurofibroma and the loss of bone in the first operation.

Dr. Marshall Matz, a board-certified neurosurgeon, testified as an expert witness for Avis. Matz based his testimony upon X rays taken before the first surgery and X rays taken afterwards. Matz stated that the lack of angulation revealed by X rays taken before the first surgery and the angulation shown by the X rays taken afterwards indicated to him that such angulation and instability were caused by the first operation, not the accident.

Subsequently, the jury returned a verdict for $1,495,000 for Heather against both Murray and Avis. The jury answered "yes" to the special interrogatory asking if Murray was within the scope of his employment at the time of the accident.

OPINION

I

■ At the outset, we note that Murray's brief does not conform to the requisites of Supreme Court Rule 342(a) (134 Ill. 2d R. 342(a)) in that it does not contain an appendix. Compounding this error is the fact that the statement of facts contained in Murray's brief is devoid of any citation to the record as is mandated by Supreme Court Rule 341(e)(6). (134 Ill. 2d R. 341(e)(6).) Thus, it is next to impossible for this court to assess whether the facts as presented by Murray are an accurate and fair portrayal of the events in this case.

"Adherence to Supreme Court Rules 341(e) and 342(a) is not an inconsequential matter. The purpose of the rules is to require parties to proceedings before a reviewing court to present clear and orderly arguments so that the court may properly ascertain and dispose of the issues involved. [Citation.] Where an appellant's brief fails to comply with the rules, this court has inherent authority to dismiss the appeal for noncompliance with its rules." (*Zadrozny v. City Colleges* (1991), 220 Ill. App. 3d 290, 292-93, 581 N.E.2d 44.) Accordingly, Murray's appeal is dismissed for failure to comply with Supreme

Court Rules 341(e)(6) and 342(a) and, therefore, we shall restrict our comments to those issues raised by Avis in its appeal.

## II

Avis begins its appeal with the argument that the trial court committed reversible error by denying its motion for judgment notwithstanding the verdict.

The standard to be employed by a reviewing court in assessing the propriety of a denial of a motion for judgment notwithstanding the verdict is well established in Illinois. A judgment notwithstanding the verdict ought to be granted only in those cases where all the evidence, when viewed in its aspect most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

Avis contends that the trial court erred in not granting its motion for a judgment notwithstanding the verdict because there was no substantial evidence that Murray was within the scope of his employment for Avis at the time of the accident. Specifically, Avis urges that the statement attributed to Murray by Deputy Norby did not relate to Murray's destination at the time of the accident and should not be construed as contradicting Murray's testimony concerning his true destination; Murray's alleged post-occurrence statement carried no weight because of the circumstances under which it was made; Murray's testimony established that he was not within the scope of his employment at the time of the accident; and plaintiffs' circumstantial evidence did not tend to prove that Murray was destined for O'Hare airport at the time of the accident. Thus, according to Avis, it cannot be held liable to Heather under the doctrine of *respondeat superior*.

██ It is settled law that the doctrine of *respondeat superior* applies only when an employee is acting within the scope of his employment and the employee must be acting within the scope of his employment with respect to the occurrence or transaction that gave rise to injury at issue. (*Richard v. Illinois Bell Telephone Co.* (1978), 66 Ill. App. 3d 825, 844, 383 N.E.2d 1242.) Section 229 of the Restatement (Second) of Agency (1958) sets forth the following factors to be considered in determining scope of employment:

"§229. Kind of Conduct within Scope of Employment.

(1) To be within the scope of employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.

(2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters are to be considered:

(a) whether or not the act is one commonly done by such servants;

(b) the time, place and purpose of the act;

(c) the previous relations between the master and the servant;

(d) the extent to which the business of the master is apportioned between different servants;

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal." Restatement (Second) of Agency §229 (1958).

After a careful review of the record, applying the *Pedrick* standard in tandem with section 229 of the Restatement (Second) of Agency (1958), we conclude that the trial court correctly denied Avis' motion for judgment notwithstanding the verdict.

■ From our review of the evidence presented at trial, we believe there was ample evidence from which the jury could conclude that Murray was acting within the scope of his employment. The jury chose to accept Heather's theory of the case. While Avis' theory is quite different, it is within the province of the jury to determine the credibility of witnesses, weigh evidence, and resolve conflicts. (*Bass v. Washington-Kinney Co.* (1983), 119 Ill. App. 3d 713, 728, 457 N.E.2d 85.) We shall not permit Avis to retry the facts of the case in this forum. Therefore, we cannot conclude, as Avis urges, that the evidence, when viewed in a light most favorable to Heather, so overwhelmingly indicated that Murray was not acting within the scope of his employment such that the verdict in this case cannot stand.

## III

Similarly, we reject Avis' next contention that the trial court erred in not granting Avis a new trial because the verdict was against the manifest weight of evidence. We hold, for the reasons stated above, that the trial court properly denied Avis' motion for a new trial as there was more than sufficient evidence to conclude that Murray was acting within the scope of his employment at the time of the accident. *Tedrowe v. Burlington Northern, Inc.* (1987), 158 Ill. App. 3d 438, 511 N.E.2d 798.

## IV

■■ Avis' next contention is that it should be granted a new trial as to the issue of damages because the trial court erred in allowing Heather's expert to testify regarding a previously undisclosed opinion concerning her need for further surgery. Thus, Avis asserts that the trial court failed to follow the mandate of Supreme Court Rule 220(d), which provides:

> "(d) Scope of Testimony. To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings through interrogatories, deposition or requests to produce, his direct testimony may not be inconsistent with nor go beyond the fair scope of the facts known or opinions disclosed in such discovery proceedings. However, he shall not be prevented from testifying as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings." 134 Ill. 2d R. 220(d).

Rule 220 was designed to remove gamesmanship from litigation by removing from it the element of surprise. (*Fogarty v. Parichy Roofing Co.* (1988), 175 Ill. App. 3d 530, 529 N.E.2d 1055.) The rule's function is to allow litigants to learn and rely upon the nature of the opinions of their opponent's experts. *Bart v. Union Oil Co.* (1989), 185 Ill. App. 3d 64, 540 N.E.2d 770; 134 Ill. 2d R. 220, Committee Comments.

In support of its contention that the trial court should have barred the testimony of Castro, Avis submits that the decision of *Huelsmann v. Berkowitz* (1991), 210 Ill. App. 3d 806, 568 N.E.2d 1373, is controlling of the case *sub judice*. We cannot agree.

In *Huelsmann*, a medical malpractice case, the plaintiff submitted an interrogatory which asked the defendant to provide him with the conclusions and opinions and bases therefor of each expert the defendant expected to call at trial. The defendant's answer merely

stated that based upon the expert's education and training and medical authority, it was the expert's opinion that the care and treatment rendered by the defendant doctor was appropriate and did not deviate from accepted medical standards.

■ The *Huelsmann* court ruled that the trial court there did not abuse its discretion in barring the testimony of the defendant's expert. The court found the defendant had effectively excluded the expert's opinion and its basis because the answer was little more than a "blanket statement that defendant's expert would testify favorably for the defendant." (*Huelsmann*, 210 Ill. App. 3d at 810.) Here, plaintiffs' answer to Avis' question is easily distinguishable from the one at issue in *Huelsmann*. In this case, Avis was provided with Slavick's report, which stated that he based his opinion on his examination of Heather and her medical records. His report discusses both of Castro's operations on Heather, as well as noting the accident to be the cause of Heather's injuries. Moreover, during Slavick's deposition he agreed that the first surgery led to instability and excessive angulation necessitating a second surgery. In fact, it was Avis' counsel who, while given ample opportunity to do so, failed to follow up at Slavick's deposition on whether the first surgery was the sole cause of the second surgery, whether there were other causes for the second surgery, or whether the accident had any relation to the second surgery. In addition, Avis knew that Castro had prior to Slavick's deposition been deposed and expressed his opinion that the accident was the cause of both operations. Thus, Avis was provided with far more information here than was the defendant in *Huelsmann*. Therefore, we find the trial court did not err in refusing to bar Slavick's testimony.

## V

■ Still to be considered is Avis' assertion that the trial court abused its discretion by compelling Avis to respond to an untimely Supreme Court Rule 237 (134 Ill. 2d R. 237) notice to produce at trial, thereby denying Avis a fair trial. It is Avis' position that what plaintiffs' labeled a Rule 237 request for production was nothing more than an improper, belated request for production that should have been served upon Avis within the context of discovery.

Avis relies solely upon the holding of *Campen v. Executive House Hotel, Inc.* (1982), 105 Ill. App. 3d 576, 434 N.E.2d 511, as being dispositive of this issue. However, we believe that *Campen* is not analogous to the facts in the case at bar.

In *Campen*, the court correctly found that the trial court properly denied defendant's request for an order compelling the plaintiff to

comply with its notice to produce documents as the defendant could have obtained, through the diligent use of discovery, the documents it requested. The *Campen* court focused on the fact that the notice was filed the day before trial commenced and that despite two pretrial conferences with the trial court, the notice was not brought until the eve of trial. Unlike the situation in *Campen*, where the defendant made a series of new and onerous requests upon the plaintiff, plaintiffs in this case did not seek any new information. Instead, plaintiffs sought only production of witnesses and documents they intended to use at trial that were within the control of Avis and were the subject of previous discovery. Thus, plaintiffs' request was within the contemplated use of Rule 237. Accordingly, we find that the trial court did not abuse its discretion in compelling Avis to respond to plaintiffs Rule 237 request.

## VI

■ Avis next submits that the trial court abused its discretion by allowing Walford to testify to the speed of impact of the car driven by Murray. It is Avis' assertion that: (1) Walford lacked the requisite expertise to determine Murray's speed at impact based solely upon the damage to Avis' car; (2) accident reconstruction testimony is inadmissible to contradict eyewitness testimony unless it is based upon expertise beyond that possessed by the average juror; and (3) Avis was prejudiced by the admission of Walford's opinion. We agree with Avis that the trial court abused its discretion in allowing into evidence Walford's testimony.

Avis directs our attention to the decision in *Dauksch v. Chamness* (1973), 11 Ill. App. 3d 346, 296 N.E.2d 592. In that case, the court held that a State trooper with 16 years' experience, who had investigated numerous accidents, was not qualified to testify as an expert witness. The *Dauksch* court focused on the fact that the jury, as the trier of fact, could draw its own conclusion as to the point of impact in the accident at issue in the case without need of the trooper's opinion. Moreover, the court noted "that the trooper's opinion was not based upon any special knowledge and application of principles of physics, engineering or other sciences beyond the ken of the average juror." (*Dauksch*, 11 Ill. App. 3d at 353.) This is what occurred in the case at hand. While Walford was certainly qualified to testify about the situation he found upon his arrival at the accident scene, he could not lend any specialized expertise to the jury's deliberations because his opinion was not based on any scientific knowledge or training.

Thus, admission of Walford's opinion as to the speed at impact when the car driven by Murray rear-ended plaintiffs was in error.

Having found that the admission of Walford's opinion was in error, we must now examine whether such error requires reversal of the judgment. Murray testified that he was traveling at approximately thirty to 35 miles per hour as he approached the intersection of Gary Avenue and Lake Street. Thus, Walford's testimony is not inconsistent with Murray's. Accordingly, we believe Walford's testimony was merely cumulative and, therefore, the trial court's action was harmless error that does not warrant reversal of the judgment. *Dauksch*, 11 Ill. App. 3d 346, 296 N.E.2d 592.

## VII

■ Finally, Avis urges that the trial court erred in restricting its cross-examination of Heather with respect to her reasons for returning to work. However, this issue is not cognizable on appeal as Avis failed to make an offer of proof for this line of inquiry. "It is well established that an offer of proof is necessary, where the trial court has excluded the testimony of a witness on a particular matter, to preserve the question for review." (*Tarshes v. Lake Shore Harley Davidson* (1988), 171 Ill. App. 3d 143, 149, 524 N.E.2d 1136.) Thus, Avis has waived this issue by its failure to make the requisite offer of proof.

For the reasons stated above, the judgment of the circuit court of Cook County in Avis' appeal, No. 1—92—0220, is affirmed, and the appeal of Murray, No. 1—92—0221, is dismissed.

No. 1—92—0220, Affirmed.
No. 1—92—0221, Dismissed.

CERDA and GREIMAN, JJ., concur.