THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRIS TOWNSEND, Defendant-Appellant.

First District (3rd Division)　No. 1—93—0662

Opinion filed August 30, 1995.

Joseph J. Zaknoen, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Joan Frazier, Assistant State's Attorneys, of counsel), for the People.

JUSTICE TULLY delivered the opinion of the court:

After a jury trial, defendant, Chris Townsend, was convicted of aggravated battery in violation of section 12—4(b)(1) of the Criminal Code of 1961 (720 ILCS 5/12—4(b)(1) (West 1992)), attempted armed robbery in violation of sections 8—4 and 18—2 of the Criminal Code of 1961 (720 ILCS 5/8—4, 18—2 (West 1992)), armed violence in violation of section 33A—2 of the Criminal Code of 1961 (720 ILCS 5/33A—2 (West 1992)), and aggravated battery on a public way in violation of section 12—4(b)(8) of the Criminal Code of 1961 (720 ILCS 5/12—4(b)(8) (West 1992)). Defendant was sentenced to concurrent 14-year prison terms for the armed violence and attempted armed robbery counts, concurrent with five-year prison terms on each of the aggravated battery convictions. It is from the judgment of conviction that defendant now appeals to this court pursuant to section 6 of article VI of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Supreme Court Rule 603 (134 Ill. 2d R. 603).

For the reasons which follow, we affirm in part and reverse in part and remand with directions.

On the evening of March 8, 1992, Thomas Tynski was working as the assistant manager of the Walgreen Drug Store located at 333 Mannheim Road in Bellwood, Illinois, which closed at 9 p.m. Tynski and several other employees worked late that night after closing the store to prepare it for the next day's business. Tynski was the last employee to leave the store that night, departing at 11:50 p.m. Before going Tynski made sure that the safe, which contained about $10,000, was locked. The safe was located approximately 10 feet from the store's front door. In addition, Tynski set the store's burglar alarm, a motion detection system, to activate 30 seconds after being set off by any motion in the store. The system was directly linked to the Bell-

wood police department and could only be shut off manually. After taking these security precautions, Tynski left the store and locked the doors.

There was light coming from the lights of the outside vestibule and from the lights inside the storefront near the safe. Tynski walked towards his automobile, which was parked about 75 feet from Walgreen's front entrance. As he walked, Tynski caught a glimpse of someone walking behind him. Tynski quickened his gait, but the man caught up with him about 15 feet from his car. The man put a gun in Tynski's back and said, "I've got a gun. Just keep walking to your car." Tynski was then ordered to "Turn around. Go back to the store." During this time, Tynski had not seen his assailant's face.

When Tynski was about 25 feet from the store's front entrance, he spotted a second man jogging towards him from the alley located 50 feet to the right of the storefront. Tynski could see the second man's face and that he was wearing black gym shoes and an all white, hooded gym suit with four black letters across the chest. Tynski later identified this second man as defendant.

When the three men were about five feet from the front door, defendant came from behind Tynski and struck him with the butt of his handgun on the left side of Tynski's face. Tynski, at this point bleeding, fell to the ground as he tried to pick up his broken glasses and keys. Defendant then attempted to kick Tynski while he was down, but Tynski managed to fend him off.

The first assailant told Tynski to open the door and go to the safe. After fumbling with his keys, Tynski opened the door and went to the safe followed by defendant while the first assailant stayed by the door. Tynski and defendant crouched down by the safe, whereupon Tynski could then see the four black letters on defendant's shirt read "ARMY." Tynski was also able at this point to get a clear view of defendant's face.

Tynski, afraid that defendant would kill him after opening the safe, feigned trying to open the safe and stalled for the 30 seconds needed to set off the alarm and alert the police. After 30 seconds lapsed, a large horn began buzzing and a blue siren in the window went off. When the alarm sounded, both Tynski and defendant jumped back. Seeing that defendant was not holding his pistol, Tynski ran toward the liquor department. Defendant picked up his gun and aimed it at Tynski. Tynski ran and dove to the floor. A few seconds later, both assailants fled the store for the alley.

Tynski telephoned the police, who arrived at the scene in less than a minute. Tynski informed the police as to the events that had just transpired and gave a description of defendant.

As these events were unfolding, Officer Robert Corner of the Memorial Park police department had just come off duty and had pulled into the Amoco gas station cater-cornered from the store. Corner heard a radio dispatch that there was an armed robbery in progress at the Walgreen Drug Store, whereupon Corner drove to the drug store, where he immediately spotted defendant emerging from behind a hair salon located next to the store and riding a bicycle and wearing a white, hooded jogging suit with four letters across the front.

Corner went to look for a vehicle that may have been parked behind the building, when he heard defendant's description over the radio. Corner then heard a second description over the radio of the jogging suit being emblazoned with the word "ARMY." Immediately after Corner radioed that he had seen a man fitting this description riding a 10-speed bicycle northbound on Mannheim Road, two Bellwood police officers radioed that they had seen an individual fitting that description on St. Charles Road.

At the same time, Bellwood police officers Edward Pacilli and Joseph Duenas were responding to the dispatch on the Walgreen's robbery. About three blocks away from the store, a man riding a bicycle rode in front of the officers' patrol car heading in the opposite direction on Mannheim Road. Pacilli had noticed that the man was wearing a white jogging suit with black lettering on it and black gym shoes. The officers then received a second dispatch that there were two suspects in the robbery, one of whom was wearing a white, hooded jogging suit with black letters on the front and black gym shoes. Pacilli turned to Duenas and said, "That's the guy."

The officers turned their car around and ordered defendant to stop. Pacilli and Duenas informed defendant that he had been stopped as he matched the description of an armed robber who had just been involved in a robbery of Walgreen's. The officers asked defendant where he had been coming from and patted him down for weapons. The officers noted the word "ARMY" on the front of defendant's shirt.

Defendant was carrying a hamburger and an unopened can of beer and did not have any weapons with him. Defendant told the police that he had come from his girlfriend's house on 118 South 46th Street in Bellwood.

Pacilli and Duenas contacted Officer Boninit at the crime scene and informed him that they had a subject wearing a white jogging suit with black letters on it. Pacilli and Duenas asked the police at the crime scene whether Tynski knew what the letters on his assailant's shirt said. Boninit told them the word was "ARMY." At this point, Officer Corner arrived at the scene and told Pacilli and Duenas

that "That's the guy I saw. He was behind the Walgreen's on a bicycle in the alley back there." The police told defendant that they were going to return to the scene, and they put defendant's bicycle in the trunk of the patrol car.

The police pulled into Walgreen's parking lot with defendant seated alone in the rear seat. As Pacilli was stepping out of the squad car, Tynski came running toward the vehicle, pointing at defendant, and said, "That's the guy. That's the guy." After defendant got out of the vehicle and stood outside the car, Tynski stated "Yeah, that's the guy that did it right there. He's the guy." At this point only 10 minutes had passed since the first police radio dispatch.

At the police station, defendant waived his *Miranda* rights and told police that he had left the house of his girlfriend, Diane Blundson, at about 11 p.m., to go to his sister's home in Bellwood and recited the route he had taken. Defendant further stated that he had taken the hamburger, french fries and can of beer with him from Blundson's home. Blundson's residence was about seven miles from the drug store. Defendant denied any involvement in the armed robbery. Defendant reiterated this sequence of events at trial.

At trial, Blundson testified that on the night of the robbery, defendant left her home on his bicycle at about 11 p.m. for his sister's home in Bellwood. James Ransfer, Blundson's son, testified that he saw defendant at his mother's home at about 10:45 p.m. or 10:50 p.m. and ride off on his mountain bicycle.

Following the closing arguments, the jury found defendant guilty as charged. Thus was the man in the four-lettered shirt ajudged to be a *homo trium litterarum*. The instant appeal followed.

■ As a preliminary matter we note that defendant's brief does not contain an appendix. Supreme Court Rule 612 (134 Ill. 2d R. 612) makes Supreme Court Rule 342 (134 Ill. 2d R. 342), a civil appeals rule, applicable to criminal appeals. (See 134 Ill. 2d R. 612.) Supreme Court Rule 342(a) provides, in pertinent part:

> "(a) Appendix to the Brief. The appellant's brief *shall* include, as an appendix, a copy of the judgment appealed from, any opinion, memorandum, or findings of fact filed or entered by the trial judge, any pleadings which are the basis of the appeal or pertinent to it, the notice of appeal, and a complete table of contents, with page references, of the record on appeal." (Emphasis added.) 134 Ill. 2d R. 342(a).

Accordingly, defendant's brief is in clear violation of Rule 342(a). (134 Ill. 2d R. 342(a).) "Compliance with Supreme Court Rule 342(a) is not an inconsequential matter. The rule's purpose is to require parties to proceedings before a court of review to present their argu-

ments in a clear and orderly fashion so that the court may properly ascertain and dispose of the issues involved." (*People v. Wrobel* (1994), 266 Ill. App. 3d 761, 765.) "A reviewing court has inherent authority to dismiss an appeal for noncompliance where an appellant's brief fails to comply with its rules." (*People v. Webb* (1994), 267 Ill. App. 3d 954, 956; see also *Collier v. Avis Rent A Car System, Inc.* (1993), 248 Ill. App. 3d 1088.) Nevertheless, as the brief is in all other respects adequate, we shall proceed with what we have.

Defendant first argues that the trial court committed reversible error when it denied defense counsel the opportunity to make an offer of proof regarding certain hearsay evidence. Specifically, defendant sought to testify that subsequent to his arrest he overheard a conversation between Darryl Eskridge and Clarence Hill in which Eskridge admitted to having committed the Walgreen's Drug Store robbery. Eskridge, invoking his right against self-incrimination, refused to testify at defendant's trial. The trial court ruled this proffered evidence inadmissible hearsay.

■ The admission of evidence is within the trial court's sound discretion, and its ruling shall not be disturbed by a court of review absent a clear showing of abuse of that discretion. (*People v. Ward* (1984), 101 Ill. 2d 443, 455-56.) Generally, a declarant's unsworn extrajudicial declaration that he, and not the defendant on trial, committed the crime at issue is inadmissible as hearsay though such declaration is against the declarant's penal interest. (*People v. Bowel* (1986), 111 Ill. 2d 58, 66; *People v. Tate* (1981), 87 Ill. 2d 134, 143.) However, such declarations may be admissible where justice requires. (*People v. Lettrich* (1952), 413 Ill. 172, 178.) Both the United States Supreme Court and the Illinois Supreme Court have held that where there are sufficient indicia of trustworthiness of such extrajudicial statements, a declaration may be admitted into evidence under the statement-against-interest exception to the hearsay rule. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 302, 35 L. Ed. 2d 297, 313, 93 S. Ct. 1038, 1049; *People v. Bowel* (1986), 111 Ill. 2d 58, 66; *People v. Tate* (1981), 87 Ill. 2d 134, 143-44.) In assessing whether there are sufficient indicia, the following four factors are to be taken into consideration: (1) whether the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) whether the statement was corroborated by other evidence; (3) whether the statement was self-incriminating and against the declarant's interest; and (4) whether there was adequate opportunity for cross-examination of the declarant. *Chambers v. Mississippi* (1973), 410 U.S. 284, 300-01, 35 L. Ed. 2d 297, 311-12, 93 S. Ct. 1038, 1048-49; *People v. Bowel* (1986), 111 Ill. 2d 58, 66-67.

◼ In *Bowel*, our supreme court permitted parties to a conversation to testify to a declarant's confession, but refused to permit a person who merely overheard the conversation to testify as to its contents. In so holding, the *Bowel* court focused upon the fact that the proffered testimony of the person not a party to the conversation was overheard and, more importantly, that the declarant was unavailable for cross-examination by the prosecution. This is exactly the situation that occurred in the case *sub judice*; defendant allegedly merely overheard Eskridge's conversation with Hill. Additionally, Eskridge was unavailable to testify and, thus, the State would not have been afforded an adequate opportunity to cross-examine him had the trial court admitted the evidence. Accordingly, we find no abuse of discretion or error in the trial court's ruling on this issue.

◼ Defendant contends that Tynski's identification of him was impermissibly suggestive. As a separate issue defendant also posits that the police lacked probable cause to stop and arrest him. The State urges that both of these points have been waived. We agree with the State.

"Speaking to this issue, the Illinois Supreme Court has held that, absent plain error, '[b]oth a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial.' " (Emphasis in original.) (*People v. Medeiros* (1993), 249 Ill. App. 3d 139, 140, quoting *People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Defendant failed to raise either of these claims in his post-trial motion. Consequently, we find the issues waived.

◼ Defendant also urges that the State racially discriminated in its exercise of peremptory challenges. However, while there is mention of the fact that 4 of the 39 members of the venire were African-Americans, there is no record of the racial makeup of the seated jurors, either before or after the *Batson* challenge. Consequently, this court has no basis for making a comparison between seated jurors and rejected jurors. It was defendant's obligation to make an adequate record during the proceedings in order to preserve the issue for review. (*People v. Rosa* (1990), 206 Ill. App. 3d 1074.) Having failed to do so, the claim is waived. *People v. Lott* (1990), 196 Ill. App. 3d 967.

◼ Next, defendant argues that the trial court erred in admitting testimony concerning police radio dispatches as such dispatches were inadmissible hearsay. We cannot agree. Our review of the trial transcript demonstrates that the testimony concerning the communications was offered for the purpose of explaining the reason and manner in which the police conducted their investigation and thus proper. (See *People v. Louisville* (1992), 241 Ill. App. 3d 772.) Ad-

ditionally, the testimony was offered for the equally legitimate purpose of demonstrating that the police had probable cause to arrest on the basis of the dispatch. *People v. Williams* (1978), 62 Ill. App. 3d 966.

■ Finally, defendant asserts that the trial court erred in sentencing him on the two aggravated battery convictions as they are lesser included offenses of armed violence. The State concedes this point and we agree. It is clear that the predicate act for the armed violence conviction was the same as that which formed the basis for the aggravated battery convictions. Accordingly, we reverse defendant's aggravated battery conviction and remand this cause to the trial court for the sole purpose of correcting defendant's mittimus.

In light of the foregoing, the judgment of the circuit court of Cook County is affirmed in part and reversed in part and remanded with directions.

Affirmed in part; reversed in part and remanded.

RIZZI and CERDA, JJ., concur.