FOURTH DIVISION
March 6, 2008

Nos. 1-04-3214 & 1-04-3230 Consolidated

| | |
|---|---|
| JERELYN YODER, Individually, and JERELYN YODER, as Special Administrator of the Estate of Teagan L. Yoder, Deceased, and JERELYN YODER, as Mother and Next Friend of ZACHARY S. YODER, a Minor, ) ) ) ) ) | Appeal from the Circuit Court of Cook County, Illinois |
| Plaintiffs-Appellees, ) ) | |
| v.                                      ) ) | No. 02 L 3002 02 L 3003 |
| JAMES N. FERGUSON, ROMAR ) TRANSPORTATION SYSTEMS, INC., RO-MAR ) TRANSPORTATION SYSTEMS, INC., ) THOMAS I. ALEXANDER, JR., and SINGLE ) SOURCE TRANSPORTATION COMPANY, ) ) | 02 L 3004 02 L 3005 |
| Defendants-Appellants and ) Third-Party Plaintiffs-Appellants; ) ) | |
| MARY BETH MARSHALL and SCOTT YODER, ) ) | Honorable Daniel M. Locallo, Judge Presiding. |
| Defendants and ) Third Party Defendants-Appellees, ) ) | |
| (Ruan Leasing Company, Roy John Adler, Berg ) Grain and Produce, Inc., Rolling Plains, Inc., David ) Knoll, Kee Transport, Inc., The Midland Grocery ) Company, Roundy's Inc., Lawrence R. Heaney, and ) Robert J. Parks, ) ) | |
| Defendants; ) | |

Nos. 1-04-3214 & 1-04-3230 (Cons.)

Joseph Rezetko,                                        )
                                                       )
       Defendant and Third-Party Defendant).          )

_____JUSTICE MURPHY delivered the opinion of the court:

This cause of action arises from a February 12, 1999, multivehicle accident just west of the Kishwaukee River Bridge (bridge) on westbound Interstate 90 near Rockford, Illinois. Plaintiff Jerelyn Yoder and her family were involved in the accident. Plaintiff's then-husband, defendant Scott Yoder (Scott), was driving their GMC Jimmy with plaintiff sitting in the passenger seat and their two children, Zachary and Teagan, in the backseat. Jerelyn and Scott suffered severe injuries in the accident. Zachary was profoundly disabled as a result of injuries suffered from the accident and Teagan was killed. Jerelyn brought suits individually, as next friend of Zachary, and as administrator of Teagan's estate (collectively, Jerelyn). Scott also brought suit against the same defendants.

Among others, Jerelyn named James Ferguson and his employer, Romar Transportation Systems, Inc. (Ferguson); Thomas Alexander and his employer, Single Source Transportation Company (Alexander); David Knoll and his employers, Kee Transport, Inc., and Roundy's, Inc. (Knoll); Mary Beth Marshall; Joseph Rezetko; and Scott as defendants. Scott named the same defendants in his suit and the cases were consolidated for trial. Prior to trial, Jerelyn entered into settlement agreements with Scott and Rezetko which were found to be made in good faith. Ferguson, Alexander, and other defendants filed contribution claims as well.

Following an eight-week trial, the jury found that Scott was at least 51% at fault and

judgment was entered against him with respect to his claims. However, in Jerelyn's case, the jury found that Scott was not the sole cause of the accident. As a result of Jerelyn's settlement with Scott, he was not included on the verdict forms for the purpose of allocating fault and the jury entered a verdict for Jerelyn that totaled $38.3 million. The fault allocation was computed among Ferguson, Alexander, Knoll and Marshall. These consolidated appeals followed.[1]

Ferguson argues: (1) the trial court erred by excluding the settling defendants from the jury fault allocation forms; (2) the exclusion of settling defendants pursuant to section 2-1117 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1117 (West 1994)) violated due process and equal protection; (3) the jury's finding in Scott Yoder's case that he was 51% or more at fault in the accident is *res judicata* in this case; (4) the trial court erred in redacting a portion of Jerelyn's statement to a treating paramedic; (5) the trial court failed to properly instruct the jury, and alternatively, and (6) the trial court erred in calculating setoff amounts with respect to Marshall's settlement.

Alexander adopts Ferguson's arguments above, except for the equal protection and due process argument, and advances additional arguments. Alexander asserts: (1) the trial court erred in denying his motion for judgment notwithstanding the verdict; (2) the trial court abused its discretion in finding that Jerelyn's settlements with Scott and Rezetko were in good faith; (3) the

---

[1]This case was ready for review on May 12, 2006. Following recusal by the assigned justice, the case was reassigned to this panel on September 6, 2007. On November 7, 2007, we set the case for oral argument on January 17, 2008.

trial court erred in not allowing testimony of Alexander with respect to the speed of the Yoder vehicle; (4) the trial court erred in admitting opinion testimony not disclosed prior to trial; and (5) that the proceedings were tainted by juror misconduct. For the following reasons, we affirm in part and reverse in part.

## I.  BACKGROUND

### A.  Pretrial Motions

Prior to trial, numerous motions *in limine* were filed. At issue on appeal are three of Jerelyn's pretrial motions and one of Alexander's granted by the trial court. Motion *in limine* number 11 sought to bar any testimony or opinions on the speed of the Yoder vehicle based on physical damage to the vehicle sustained in the crash. In motion *in limine* number 14, Jerelyn sought to exclude any reference to Jerelyn's alleged postaccident statement to paramedic James Richmond that she "told that son-of-a-bitch to slow down." Finally, following her settlement with Scott, in her trial brief, Jerelyn moved *in limine* to exclude parties that had settled in good faith from the fault allocation verdict forms.

In Alexander's motion *in limine* number 5, he moved to bar the testimony of expert Dr. John Wiechel, who completed a reconstruction of the accident and formulas ascertaining the braking coefficient and speed of various vehicles involved in the accident. Wiechel admitted during his deposition that several conclusions regarding Alexander were based on two hypotheticals and were entirely speculative. The trial court granted Alexander's motion and barred Wiechel from testifying to any opinions regarding Alexander that were based on speculation.

## B. Pretrial Settlements

Scott settled Jerelyn's claims against him for the remainder of his policy limit of $500,000, or $469,000 after payment of his medical payment limit of $15,000 to Jerelyn and other settlements not at issue. Following Jerelyn's motion to exclude settling parties from the allocation forms, Rezetko settled with Jerelyn for $300,000. Over defendants' objection, the trial court found each settlement was fair and reasonable, constituting good-faith settlements pursuant to the terms and conditions of the Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/1 *et seq.* (West 2004)). Accordingly, the actions pending against Scott and Rezetko were dismissed with prejudice.

## C. Trial Testimony and Evidence

### 1. *Mary Beth Marshall and Mary Ann Miller*

Mary Beth Marshall testified that on the day of the accident she and her coworker, Mary Ann Miller, were traveling westbound on Interstate 90 to her company's office in Rockford, Illinois. Marshall testified that it had snowed lightly, but after she passed the Belvidere toll plaza it began snowing heavily. Marshall testified that as she approached the bridge, the weather worsened to whiteout conditions - the worst conditions she had ever driven through.

Marshall testified that she was in the right-hand lane and slowed down to approximately 20 to 30 miles per hour because of poor visibility. As she approached the bridge, she was approximately one car length behind a tractor-trailer which began to fishtail. She did not lose control of her vehicle or lose traction as she continued to slow down; however, she felt that there

was black ice on the bridge. When the truck regained control, Marshall moved slowly forward in the right lane and saw Rezetko's car in her rearview mirror prior to him rear-ending her vehicle. Marshall testified that she and Rezetko slowly came to a stop approximately 25 feet apart in the right lane of traffic. Marshall next saw a truck slowly glide to a stop with its trailer crossing the Interstate approximately six car lengths from Rezetko's car.

At this point, Marshall and Rezetko drove up to the next exit and got off the Interstate to exchange information. Marshall testified that her passenger had called the police before they drove up to the exit, but that she did not personally call the police. The police called Marshall three days later to discuss the accident. Miller's testimony was consistent with Marshall's.

### 2. *Joseph Rezetko*

Rezetko also testified that the weather turned dramatically worse after he passed the Belvidere oasis and approached the bridge. Rezetko testified that it became very windy and a light rain had turned into "like an ice" and then heavy snow. From Belvidere to the bridge, Rezetko slowed his vehicle from about 55 miles per hour to 35 to 40 miles per hour. Rezetko testified that the weather continued to deteriorate and he slowed further to about 15 to 20 miles per hour just before he reached the bridge.

Rezetko testified that he was driving in the right lane behind Marshall, who did not have her lights on. At the bridge, the weather worsened and Rezetko lost sight of Marshall's car until he saw her brake lights after he passed the bridge and realized that she was stopped. Rezetko pumped his brakes and then pushed the brake pedal hard but was unable to stop before rear-ending Marshall's vehicle. The two cars remained in the right lane and two cars passed in the left

lane before Rezetko saw Ferguson's tractor-trailer slowly jackknife, coming to rest entirely blocking both lanes of the Interstate.

Rezetko then felt it was safe to exit his vehicle and check if Marshall was injured because the truck had completely blocked the Interstate. The two agreed to drive to the next exit and meet at a gas station, where they exchanged information. Rezetko testified that he called the police later that day and was referred to the Tollway Authority. He also called the Tollway Authority and left a message. Five days after the accident, Rezetko received a call from the Tollway Authority and was interviewed about the accident.

Rezetko was cross-examined regarding the police report of his accident. He admitted that there was no reference to any vehicles other than Marshall's and no mention of a jackknifed tractor-trailer. Rezetko stated that he was familiar with that stretch of the Interstate and he knew that the accident occurred just past the bridge. Rezetko admitted that the police report located the accident approximately 45 miles from the bridge, but he denied giving the police any misinformation.

### 3. *James Ferguson*

On the day of the accident, Ferguson drove a tractor-trailer truck for defendant Romar Transportation Services, which he had worked for since October 1992. Ferguson has been driving semi tractor-trailer trucks since 1984 when he received his chauffeur's license. When the law changed in 1986, Ferguson took the test for his commercial driver's license (CDL) and was familiar with the driving guidance provided by the study guide for that exam and the federal motor carrier safety regulations. Ferguson estimated that he had driven over the bridge approximately

150 times in the one to two years he had been assigned the route from the south side of Chicago to Rockford along Interstate 90. He had never experienced icy conditions on the bridge, even in worse weather conditions.

Ferguson testified consistently to the above weather conditions of that day. After passing the Belvidere Oasis, Ferguson noticed that the snowfall became heavier and visibility was reduced, so he slowed his truck from 50 to 40 miles per hour. As he approached the bridge, about five miles west of the oasis, the road surface was largely covered or obstructed by snow. However, he did not observe any problems with the road conditions or any other visual cues of other cars losing control.

At some point after the oasis, two cars passed Ferguson in the left lane at approximately 60 miles per hour. Before reaching the bridge, Ferguson saw what he believed were the same vehicles - a red vehicle and a white vehicle - facing north, across the highway with the passenger sides facing Ferguson. Ferguson continued to reduce speed to approximately 15 to 20 miles per hour by taking his foot off the accelerator. While on the bridge, Ferguson realized that the red and white cars in front of him were blocking both lanes and he pumped the brakes before applying more pressure.

Ferguson testified that when his truck failed to slow as expected, he directed it to the right shoulder along the guardrail, utilizing the guardrail for friction to help stop the truck. About this time, Ferguson realized that the bridge was "like an ice skating rink." Ferguson testified that he lost control of the truck after the bridge because of the guardrail and the ice and his vehicle jackknifed. He came to a stop, short of the cars blocking the Interstate.

Ferguson did not turn on his hazard lights at any time. When he got out of his truck, Ferguson observed that the area by the bridge was icy. He also observed that the two vehicles that were blocking the highway had left the scene. Ferguson testified that, but for the presence of those vehicles, he would have maintained control and continued safely toward Rockford, Illinois.

### 4. *Roy John Alder*

Roy John Alder testified that he obtained his CDL in 1992 and has been driving tractor-trailers since that time. On the day of the accident, Alder was driving a truck for Berg Grain and Produce westbound on Interstate 90 to Darien, Wisconsin. Alder also testified consistently to the above witnesses regarding the changing weather conditions. Alder testified that he lowered his speed to 40 to 45 miles per hour as he approached the bridge because of the weather.

Alder assumed that the bridge was icy because the surface appeared shiny. After he got to the bridge, Alder slowed down immediately because he saw the Ferguson truck completely blocking both lanes of the Interstate. Alder testified that he did not have ABS brakes, so he slowly pumped his brakes and lowered his gears to come to a complete stop in the left-hand lane. After he stopped, Alder checked his rearview mirror to see another truck approaching, so he moved his truck as quickly and safely as he could onto the shoulder and then the median. Alder testified that he was able to move his truck about 250 feet into the median, ending up stuck in the mud, west of Ferguson's truck. Alder testified that, after stopping, he heard an impact.

### 5. *Thomas Alexander*

The next vehicle to enter the scene was a tractor-trailer truck driven by Alexander, who also held a CDL. Prior to his testimony, the court conducted *voir dire* of Alexander outside the

presence of the jury to determine the basis of his opinion on the speed of Yoder's vehicle and whether that testimony would be barred pursuant to the trial court's decision on Jerelyn's motion *in limine*. Alexander testified that when he came to a complete stop he looked in his rearview mirror and saw Yoder's vehicle approach from approximately two-thirds of the bridge away. Alexander turned around to see Yoder's vehicle careen off a vehicle in the right-hand lane, come back across the Interstate and come to rest crashing under a tractor-trailer.

Alexander testified that he estimated the speed of the Yoder vehicle as it came across the bridge to be 60 to 65 miles per hour. Alexander based his estimate on the erratic way it came through traffic for the two to three seconds he witnessed the vehicle and the distance the vehicle ended up under the bumper of the tractor-trailer after impact. Alexander admitted that he testified at his deposition that the primary factor in his determination was the extent of damage to the Yoder vehicle.

The trial court held that, based on Alexander's experience driving, he could testify to his opinion on the speed of the Yoder vehicle. Alexander was not to opine as to the speed of the car based on the damage from the collision. However, the trial court understood that Jerelyn would confront Alexander with his deposition testimony that the crash and damage were his primary basis for judging the speed. The trial court stated that it would consider a nonpattern jury instruction about factors to consider in judging speed, but would not admonish the jury before Alexander's testimony.

Alexander testified before the jury that on the day of the accident he was a driver for defendant Single Source Transportation hauling palletized coil steel. He testified that he was

aware of the federal motor carrier safety regulations. Alexander had his CDL and had been driving for approximately 14 years. In fact, Alexander had been driving the same route on Interstate 90 between Chicago, Illinois, and Monroe, Wisconsin, for the previous 14 months.

Alexander testified consistently to the aforementioned weather conditions and pattern. About two miles east of the bridge, Alexander believed that he might be driving into a whiteout because visibility had quickly dropped to about 70 to 80 feet. Alexander testified that he considered a whiteout to be a reduction of visibility to 50 to 100 feet. Although Alexander agreed that the proper course of action in a whiteout is to pull off the highway whenever it is reasonably safe, he continued to drive west despite having the option to pull over.

As he approached the bridge, Alexander understood that it might be frozen and icy but continued driving at 40 to 45 miles per hour. As he reached the bridge, Alder's truck approached alongside Alexander in the left lane and passed him. Alexander testified that immediately after Alder passed him, his visibility was reduced to 15 to 30 feet because Alder's truck had kicked up snow from the highway as it passed. Alexander next saw the brake lights on Alder's truck light up and Alder veered to the left of the Interstate, onto the left shoulder and then to the median.

Alexander testified that at this time he saw Ferguson's truck ahead blocking both lanes of traffic and the right shoulder. Alexander immediately began to pump his brakes to try and slow down without losing control of his truck on the icy bridge. He first veered right, but when he realized he could not drive around Ferguson on the shoulder to avoid impact, he pushed hard on his brake pedal, locking up the brakes, and veered left to avoid a major collision. Alexander slid into Ferguson's truck, coming to rest diagonally, blocking the right shoulder and the right lane

and partially obstructing the left lane. Alexander then turned on his hazard lights.

Alexander stated that he felt he was driving appropriately for the conditions approaching the bridge at 40 miles per hour. However, he admitted that, by those actions in those weather conditions, he was not exhibiting extreme caution as required by the federal motor carrier safety regulations under these type of road conditions. Alexander also admitted that the drivers following him had to respond to the condition he created.

Alexander testified to the progression of vehicles after he stopped. When his truck came to rest, the snow had tapered to just flurries and visibility extended beyond the entire bridge. Alexander testified that Fischer in the Gwinner Oil truck came to a stop on the right shoulder and several cars came to either controlled stops or minor impacts until the Yoder vehicle approached. Alexander testified that he saw the Yoder vehicle approaching from about two-thirds the distance of the bridge, or 300 feet, at an "extremely high rate of speed" at or around 65 miles per hour. The Yoder vehicle approached erratically, bouncing off several cars before the major collision with Knoll's trailer. On cross-examination, Alexander admitted that he testified in his deposition that he principally based his estimate of the Yoder vehicle's speed on the extent of damage to the vehicle.

6. *Lawrence Harry Fischer*

Lawrence Harry Fischer testified that on the day of the accident he was driving a truck for Gwinner Oil Company west on Interstate 90, heading toward Bloomington, Illinois. As he progressed toward the bridge past the Belvidere toll plaza, the road conditions worsened to a visibility of about 6 or 7 feet, so he slowed down to 35 to 40 miles per hour. As Fischer

approached the bridge, he saw brake lights and began to slow down and move to the right shoulder. However, he hit a limousine that spun around and ended up nose to nose in the shoulder. The nose of Fischer's truck remained partly in the right lane of traffic.

As he came to a stop, Fischer saw the Roundy's truck driven by Knoll slow and pull over into the left median. Fischer called his employer to report the accident. While on the phone, Fischer heard a sound like a car skidding on the road and then an impact. He looked to the left to see that Scott had crashed into Knoll's truck. After this, Fischer believed that one car hit his trailer and two additional cars hit the front end of his cab.

### 7. *David Knoll*

David Knoll testified that on the day of the accident he was driving a tractor-trailer for Roundy's, Inc., and Kee Transportation from Indiana to Wisconsin via Interstate 90. Knoll had been driving this route three days a week for several months. Knoll testified that on the day of the accident when he was about a mile east of the bridge, his visibility was reduced to about 500 feet and he was driving in the right-hand lane at about 50 miles per hour. Knoll stated that he believed the visibility and traction were sufficient at this time and did not warrant pulling over onto the shoulder before the bridge. As he reached the bridge, visibility was reduced to only about 300 feet and dropped to about 150 feet as he reached the middle of the bridge. At this point, Knoll reduced his speed to about 47 or 48 miles per hour.

At the middle of the bridge, Knoll observed a flatbed trailer on the right shoulder so, as a courtesy, he checked his rearview and side mirrors and made a gradual move to the left lane. Knoll testified that visibility was reduced to about 100 feet at this time and when he got

-13-

approximately 100 feet from the end of the bridge he saw that Alexander's and Ferguson's trucks were obstructing the roadway and that Alder was in the left lane and shoulder. Knoll was traveling less than 45 miles per hour and quickly reduced speed. Knoll saw an opening behind and to the left of Alder and tried to pull off the road onto the median. Alder began to pull onto the median at this time and Knoll followed until his tires got stuck in the mud and his truck stalled. However, on cross-examination, Knoll admitted that his truck's engine log registered revolutions per minute after he came to a stop, indicating that the truck did not stall. In any event, Knoll came to a complete stop partly in the median, with his trailer remaining partly in the left lane. Knoll did not turn on his hazard lights but maintained pressure on his brake pedal, leaving his brake lights activated for the final 17 seconds his truck was traveling.

Approximately five seconds after coming to a complete stop, Knoll testified that he felt an impact to the rear of his vehicle. Approximately three seconds later, Knoll felt a second impact. Knoll exited his truck and saw the Yoder vehicle under his trailer and heard moaning and groaning sounds coming from inside the vehicle. Knoll testified that, though the road surface was wet and there was ice in the rumble strips on the shoulder, he had no problem making the maneuver into the left lane or slowing to a stop.

### 8. *Amyrose Riedel*

Amyrose Riedel testified that she and her family were traveling in their 1994 Jeep Grand Cherokee to Madison, Wisconsin, on the day of the accident. After passing the Belvidere toll plaza, Riedel reduced her speed from approximately 65 miles per hour to 30 to 35 miles per hour because she could see that the weather and road conditions were worsening. Eventually, Riedel

-14-

attempted to move from the left lane into the right lane because she knew there was an exit in the area and wanted to get off the highway because she felt unsafe due to the weather.

However, at this time, Riedel saw Knoll's truck with its lights on going from right to left, so she started to return to the left lane. At this time, although it did not have its lights engaged, Riedel saw Alexander's truck in the left lane fishtailing from left to right very close to her. Riedel testified that she turned her steering wheel to the left to avoid the truck. In response, her husband grabbed the steering wheel and pulled it to the right because he was concerned about the bridge. Riedel testified that they collided like a "pinball," twice in immediate succession off of Knoll's truck and then they hit Alexander. Riedel testified that when they were colliding with the trucks, she heard an extremely loud sound that she described as torn metal that she did not know where it came from. Approximately 30 seconds after coming to rest against Alexander's truck, a pickup truck crashed into her car. Riedel opined that if the lights for Alexander's truck had been engaged, she would have had a better opportunity to avoid the collisions.

### 9. *Jerelyn and Scott Yoder*

Both Jerelyn and Scott Yoder testified that on the day of the accident they were driving westbound on Interstate 90 to Door County, Wisconsin. Both witnesses testified that when they started their trip the weather was nice. Both witnesses also testified that after it began to snow and it began to get cloudy, they have no memory of anything until waking up after the accident.

### 10. *Delores Vole*

Delores Vole testified that on the day of the accident she was driving in her Pontiac Grand Prix on Interstate 90 to Rockton, Illinois, on business. After Vole passed the Belvidere toll plaza,

she noticed that the Yoder vehicle was approximately three car lengths ahead of her and continued following them from that distance. Vole testified that as she approached the bridge she slowed down to approximately 30 miles per hour because visibility had deteriorated significantly. Vole testified that the Yoder vehicle slowed down concurrently.

Although it was snowing heavily, Vole testified that she did not notice any loss in traction and felt that the road conditions were safe going 30 miles per hour. Vole again saw the Yoder vehicle's brake lights appear and then a tractor-trailer slid toward her from the right lane. Vole testified that her next recollection is waking up in the hospital. Vole has no recollection of being involved in a collision.

### 11. *Dr. Lawrence Heaney*

Dr. Lawrence Heaney testified that on the morning of the accident he was traveling westbound on Interstate 90 to Madison, Wisconsin. After Heaney passed the Belvidere toll plaza it began snowing heavily, creating varied road conditions that occasionally lapsed to slippery from the snow and slush. However, Heaney felt that he remained in control by simply varying his speed between 55 and 30 miles per hour. During this time, the speed of other cars varied, with several cars passing him at high rates of speed. Approximately four or five miles past the toll plaza, Heaney saw heavy snow ahead and took his foot off the gas.

Although Heaney expected to encounter conditions similar to those he already had driven through, he did not know he was approaching the start of the bridge and he continued driving 45 miles per hour. Suddenly, there was a very abrupt change in the weather and road conditions, much worse than anything he had seen that day. At point, Heaney hit what he called a "wall

of snow" and visibility was reduced to 50 to 100 feet. Heaney then saw "dark shadows" ahead of him and he began to brake lightly. Heaney began to brake harder when he noticed that Fischer's flatbed trailer was in the right shoulder. Heaney next observed that Fischer's cab was projecting into the right lane and he slammed on his brakes but was surprised it was "very, very slick" and his braking and attempt to move the vehicle to the left had "virtually no effect."

Heaney attempted to pump his brakes to slow down, but he was unable to avoid hitting Fischer's front tire. Heaney testified that in quick succession, he was pushed to the left and bounced off the Yoder vehicle's side. Heaney continued to try and brake, but then hit the Reidel car "solid" at 35 to 40 miles per hour and stopped. Heaney waited in his vehicle for a moment, heard "another thump or two," but was not involved in another collision and exited his vehicle.

### 12. *Dr. Walter Scott Jellish*

Dr. Walter Scott Jellish testified that on the morning of the accident he was in the front passenger seat with his wife driving west on Interstate 90 to the Wisconsin Dells. Jellish, an anaesthesiologist, had spent the prior night on-call and was sleeping intermittently until his wife woke him up reporting the heavy snowfall. Jellish testified that visibility was "almost zero" and told his wife to stop the car when he saw brake lights in front of them. His wife stopped the car several feet behind the car in front of them. Jellish waited in the car for four to five minutes and talked with his partner, who had been driving behind them, before the two men went to assist paramedics on the scene.

### 13. *Lance Powell*

Master Sergeant Lance Powell of the Illinois State Police testified to his course work and

qualifications as an accident investigator and reconstructionist. Powell testified that on the date of the accident, he responded to the scene at about 12:15 p.m., approximately 1.5 hours after the accident occurred. When he arrived there was no snow on the road, only the shoulder and grass and dirt areas still had snow cover. Several cars had been moved from their final resting places by rescue personnel while rendering aid to the victims.

Powell testified that all vehicles involved in the accident were located west of the bridge and positioned consistently with the above descriptions. Powell stated that it did not appear that the Knoll truck had gotten stuck in the mud as there was no earth piled around the tires, but that it had rolled into place. Powell opined that Alexander could have maneuvered his truck to the right shoulder and off the roadway, beyond the guardrail and before Ferguson's truck.

Powell testified that he had five years' experience driving tractor-trailer trucks in Illinois from 1981 to 1986. He stated that he based his opinion on the above maneuver for Alexander based on his experience, photographs, his viewing of the roadway and Alexander's final position. Powell further opined that, if Alexander had accomplished this, there would have been room on the right shoulder for other cars to maneuver.

On cross-examination, Powell admitted that he did not know the precise distance between the guardrail and Ferguson's trailer. Furthermore, he admitted that there were concerns in making the suggested maneuver, namely, getting stuck in the soft surface of the ditch and simply going into the ditch and not being able to get up and out of the ditch. Upon further questioning, Powell also admitted that, depending on what, and how, the truck was loaded, driving down into the ditch could allow the payload to shift and rupture the trailer.

14.  *Ronald Bowes and James Anthony Richmond*

Ronald Bowes and James Anthony Richmond each testified as treating paramedics. Bowes testified that he drove to the scene that day, describing the conditions as very slippery and stating that it took seven minutes to arrive, almost twice the typical time for that location.  As described above, Bowes assisted in removing Zachary from the Yoder vehicle and attended to him in the ambulance with Jellish until Zachary was transported via helicopter from the scene.

Before Richmond testified, the court reiterated that the term "son-of-a-bitch" was not to be used.  Richmond testified that he was in the first ambulance on the scene and mostly conducted triage that day, organizing and directing the rescue efforts.  Richmond stated that he did not recall rendering Jerelyn any medical aid.  However, he did render emotional assistance and did talk with Jerelyn.  After having his recollection refreshed, Richmond testified that he asked Jerelyn if she had been knocked out and she responded that she had not.  He further testified that Jerelyn told him that she "told him to slow down."  Richmond stated that this surprised him because he had never heard that before at the scene of an accident.

15.  *Robert Coulter*

Robert Coulter testified that he is an expert trucking accident consultant and reconstructionist with years of experience both driving tractor-trailers more than 900,000 miles and as an instructor of a tractor-trailer driving school.  Coulter testified that in 1986, the United States Department of Transportation codified standardized CDL written and skills' standards for the states to follow in licensing drivers.  See 49 C.F.R. pt. 383 (2007).  Coulter noted that the stated purpose of the regulations was to reduce crashes, injuries, and fatalities involving large

trucks and buses.

Coulter testified that the regulations require a CDL holder to have the knowledge and skills of hazard perception to understand the hazards caused by driving in certain conditions and among other vehicles. In addition, drivers must have the skill to make emergency maneuvers to avoid and recover from any hazards. Coulter stated that section 392.14 (49 C.F.R. §392.14 (1995)) specifically applies to truck drivers and mandates the use of "extreme caution" anytime snow, ice, sleet, fog, mist, rain, dust, or smoke adversely affect driving conditions. Coulter testified that the regulations mandate a reduction in speed, including slowing down to a "crawl," approximately 10 miles per hour, when approaching a bridge in freezing conditions. Coulter later modified this statement by declaring that specific speed reduction was not in the regulations, but it was the industry standard.

Coulter testified that he teaches proactive driving is absolutely necessary when driving a tractor-trailer truck. This involves having a plan going into a drive and understanding what could present a hazard on that day, the appropriate hazard perceptions, and responses for those likely situations. In addition, Coulter testified that a driver must maintain a proper "look out," maintaining a 12- to 15-second lead time in front to anticipate and adequately respond to hazards. Coulter testified that this lead time varies with different speeds and driving conditions. Specifically, Coulter opined that with snowfall and low temperatures, the only safe assumption approaching a bridge is that it will be icy and the driver should reduce his speed to a crawl and engage his flashers.

Coulter explained that a tractor-trailer truck will jackknife when tires lock up and slide

sideways, causing the trailer to move to an angle of greater than 15 degrees with the cab. Coulter stated if this occurs, the driver has lost all control and it is extremely unsafe. Based on photographs of the accident scene and depositions that he had reviewed, Coulter described the trucks driven by Ferguson, Alexander and Knoll as in jackknife positions.

### 16. *Dr. John Wiechel*

Dr. John Wiechel testified as an expert on behalf of Knoll. Wiechel testified that he had a Ph.D. in mechanical engineering with expertise in vehicular accidents, particularly biomechanical analyses of accidents. Wiechel testified that he physically inspected vehicles that were involved in the accident, the accident scene, as well as reviewed police reports, vehicle minute logs, photographs and deposition transcripts. Wiechel conducted a topographical study of the accident scene and completed an accident reconstruction including a computer simulation estimating the various speeds of the vehicles as they approached their final resting spots.

Wiechel testified that he determined that Knoll's trailer was sliding as he came to the shoulder at the end of the bridge and eventually the right side of his trailer bumped the left rear corner of Alder's trailer. Wiechel stated that this occurred because Alder was slowly moving into the median to open a path to the median between his trailer and the guardrail. Wiechel testified the evidence showed that Knoll never lost control of his truck. Rather, Wiechel opined that Knoll came to a controlled stop and was mistaken when he believed his truck stalled. Wiechel further opined that Knoll reached the bridge at 50 miles per hour and his prebraking speed was 49 miles per hour, then he applied the brakes for 17 seconds in coming to a stop.

On cross-examination, Jerelyn's counsel asked Wiechel if the Ferguson and Alexander

trucks had already blocked the Interstate and were past the Alder and Knoll vehicles. Counsel for Alexander objected to this line of questioning, arguing that Wiechel never disclosed an opinion as to the position of the Alexander vehicle at any certain point in time. The court overruled the objection, stating that on cross-examination, such questioning was allowed under Rule 213 (210 Ill. 2d R. 213). Wiechel also testified over Alexander's objection that he had concluded that Alexander had jackknifed. The trial court sustained an objection to the follow-up question that Alexander would have jackknifed if Ferguson had not been present. The trial court later rejected Alexander's request for a follow-up question. The trial court determined that its instruction to disregard the question about Alexander's driving was sufficient to meet its holding with respect to barring speculative testimony on Alexander's actions.

Also, because of a discrepancy between witnesses regarding Yoder's speed at impact, the trial court allowed Wiechel to offer his opinion. Based on a crush analysis, Wiechel opined that Yoder was traveling faster than Heaney. Wiechel calculated that, after colliding with Heaney at 36 to 43 miles per hour, Yoder's speed at impact with Knoll was 34 miles per hour.

### D. Jury Instructions and Verdict

During the jury instructions conference, Ferguson tendered both Illinois Pattern Jury Instructions, Civil, Nos. 12.04 and 12.05 (2000) (hereinafter IPI Civil (2000)). Ferguson was joined by the other defendants in tendering fault allocation forms under section 2-1117 of the Illinois Code of Civil Procedure that included defendants who had settled and been dismissed. Over Ferguson's objection, the trial court accepted Ferguson's withdrawal of IPI Civil (2000) No. 12.05 and gave the short form of IPI Civil (2000) No. 12.04. Also over the defendants'

objection, as noted above, the trial court denied their request to include defendants who had settled on the fault allocation form under section 2-1117.

On March 26, 2004, the jury entered a verdict in favor of Jerelyn in all capacities, against Ferguson, Alexander, Knoll and Marshall. The jury apportioned fault among the four defendants at 30% for Ferguson, 10% for Alexander, 27% for Knoll, and 33% for Marshall. The jury awarded Jerelyn a total of $38,300,000: $7,300,000 individually; $27,500,000 as mother and next friend of Zachary; and $3,500,000 as special administrator of Teagan's estate. Accordingly, under these allocations, the verdict against each named defendant was $11,490,000 for Ferguson, $3,830,000 for Alexander, $10,341,000 for Knoll, and $12,639,000 for Marshall. The jury found for Ferguson and Alexander on their contribution claims against Marshall.

The jury answered the special interrogatory whether Scott was the sole proximate cause of Jerelyn's injuries in the negative. However, in Scott's consolidated case, the jury found in favor of the defendants and against Scott Yoder. The jury found Scott more than 51% at fault for his own injuries.

### E. Posttrial Motions

Following the jury verdict, Marshall settled her claim with Jerelyn for $10,800,000. On July 2, 2004, the trial court entered an order finding this settling was entered into in good faith, dismissing Marshall from the cause of action and vacating the contribution judgment against her. The trial court overruled Ferguson's objection that the settlement was not made in good faith because Marshall would be paying $1.83 million less than her adjudicated amount. The trial court also denied posttrial motions from Ferguson and Alexander. An additional $11,180,000 setoff

was entered from the $10,341,000 Knoll settlement, $469,000 Scott settlement, $270,000 Rezetko settlement, and $100,000 Robert Parks settlement. These appeals followed.

## II. ANALYSIS

### A. Denial of Alexander's Motion for Judgment Notwithstanding the Verdict

Alexander argues that the jury verdict was against the manifest weight of the evidence presented at trial and the court erred in denying his motion for judgment notwithstanding the verdict (judgment *n.o.v.*). Factual determinations made at trial will stand unless contrary to the manifest weight of the evidence. *North Avenue Properties, L.L.C. v. Zoning Board of Appeals of the City of Chicago*, 312 Ill. App. 3d 182, 184 (2000). A reviewing court will not set aside a jury verdict unless the opposite conclusion is readily apparent or it appears the jury's findings are arbitrary, unreasonable, or unsubstantiated by the evidence. *Johnson v. Chicago Transit Authority*, 248 Ill. App. 3d 91, 94 (1993).

The standard for entry of a judgment *n.o.v.* is high and this court reviews *de novo* a denial of such a motion. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006). In order to reverse, this court must find the trial court abused its discretion in denying the motion. *York*, 222 Ill. 2d at 179. The evidence must be viewed with all reasonable inferences in favor of the plaintiffs, and we may uphold a decision on any basis appearing in the record. *Arangold v. Zehnder*, 187 Ill. 2d 341, 359-60 (1999).

Alexander agrees with this well-established standard of review. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). He adds that a jury may not base its verdict on guess, speculation or conjecture, but only on sound and substantial facts. *Van Steemburg v.*

*General Aviation, Inc.*, 243 Ill. App. 3d 299, 320 (1993). If the evidence produces a mere possibility of negligence, a directed verdict is proper. *Van Steemburg*, 243 Ill. App. 3d at 322.

Alexander argues that the evidence presented at trial did not establish that he was a proximate cause of the injuries sustained by the Yoders. To establish proximate cause, a party must first show that the defendant's negligence was the actual cause of the injury. *Bourgonje v. Machev*, 362 Ill. App. 3d 984, 1007 (2005). Alexander notes that the negligence at issue must be a material and substantial factor in the injury and not just furnish a condition by which the injury is made possible. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257-58 (1999). A party must also show that defendant was the legal cause of the injury by proving the defendant's conduct was so closely tied to the injury that he may be found legally responsible. *Bourgonje*, 362 Ill. App. 3d at 1007.

Alexander claims that no evidence was presented at trial that demonstrated that the action and final resting place of Alexander contributed in any way to the Yoder crash and resulting injuries. Alexander asserts that the facts show that he was the fifth of 15 vehicles to arrive on the scene and that he successfully came to a stop, avoiding a collision on the right-hand side of the Interstate. Therefore, Knoll, who ended up on the left side of the Interstate, was not influenced by Alexander and still had options to move into the median. Alexander continues to argue that the evidence further shows that Yoder was out of control at 60 to 65 miles per hour and unable to take advantage of the option available to escape harm by utilizing the opening between Knoll and the bridge abutment.

As noted by the *Galman* court, the jury is charged with deciding the issue of proximate

cause and to support a motion for judgment *n.o.v.*, the evidence viewed in a light favorable to the plaintiffs must overwhelmingly favor the movant so that " 'no contrary verdict *** could ever stand.' " *Galman*, 188 Ill. 2d at 257, quoting *Pedrick*, 37 Ill. 2d at 510. It cannot be said that, based on the extensive evidence presented at trial and summarized above, no contrary verdict could ever stand. Accordingly, Jerelyn's arguments that the evidence supports the trial court's denial of Alexander's motion are convincing.

Jerelyn argues that Alexander simply bases his argument on his own, self-serving testimony and the full evidence at trial supports the jury's findings. Jerelyn notes that Alexander ended up diagonally across the entire right shoulder and right lane, cutting off the entire right side of the Interstate. This occurred despite Powell's testimony that Alexander had room and an opportunity to drive onto the right shoulder and off the roadway. As such, Knoll and the subsequent drivers, including Scott, all had to react and deal with Alexander's blocking portions of the Interstate.

Evidence was also presented, contradicting Alexander, that Yoder was traveling anywhere from 30 to 46 miles per hour before impact, a marked difference from Alexander's claim of 60 to 65 miles per hour. Furthermore, evidence was presented that the industry standard for drivers in these conditions is to exercise extreme caution and travel at speeds far less than Alexander was traveling. This evidence was sufficient to deny Alexanders motion for judgment *n.o.v.*

B. Section 2-1117 of the Illinois Code of Civil Procedure

The central issue on appeal in this case is whether the trial court erred in not including settling defendants Scott and Rezetko on the fault allocation jury verdict form pursuant to section

-26-

2-1117 of the Illinois Code of Civil Procedure. 735 ILCS 5/2-1117 (West 1994). Ferguson and Alexander argue that the plain language of the statute and case law require the inclusion of all defendants sued on the fault allocation forms. Secondly, Ferguson argues that the trial court's ruling violates their rights to equal protection and due process.

1. *Fault Allocation Under Section 2-1117*

Review of the application of section 2-1117 is *de novo*. *Unzicker v. Kraft Food Ingredients Corp.*, 203 Ill. 2d 64, 74 (1994). At the time of the accrual of the causes of action in this case, section 2-1117 provided, in full:

"Except as provided in Section 2-1118, in actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, all defendants found liable are jointly and severally liable for plaintiff's past and future medial and medically related expenses. Any defendant whose fault, as determined by the trier of fact, is less than 25% of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendant who could have been sued by the plaintiff, shall be severally liable for all other damages. Any defendant whose fault, as determined by the trier of fact, is 25% or greater of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendants who could have been sued by the plaintiff, shall be jointly and severally liable for all other damages." 735 ILCS 5/2-1117 (West 1994).

At the hearing on Jerelyn's motion, the trial court stated that it had no right to disregard

the appellate court decision in *Lombardo v. Reliance Elevator Co.*, 315 Ill. App. 3d 111, 124-25

(2000). In *Lombardo*, the First District of this court adopted the holding of the Fifth District in

*Blake v. Hy Ho Restaurant, Inc.*, 273 Ill. App. 3d 372 (1995). Accordingly, the trial court

granted Jerilyn's motion to exclude settling defendants from the fault allocation forms. The trial

court made its hesitation known, noting that, whether or not it disagreed with a ruling of the

appellate court, it had no discretion to ignore the ruling. The trial court continued to state:

> "*Lombardo* is at 315 Ill. App. Page [111], whether it is artfully written or
>
> clear, the language states the following: Even though the Court should include the
>
> bank and other settling defendants on the verdict form, it should consider the fault
>
> of only those parties specified in Section 2-1117 for purposes of determining joint
>
> liability. Following *Blake*, the Court should not subject the settling defendants to
>
> the expense of discovery, although the parties remain free to present any available
>
> evidence concerning the fault of the non-parties.
>
> Mr. Mullen, you read [*Lannom v. Kosco*, 158 Ill. 2d 535 (2002)],
>
> philosophically, I may or may not agree with you. But the language of [*Lannom*],
>
> the Illinois Supreme Court [i]n discussing 2-1117 the defendant's rights under
>
> Section 2-1117 are not abolished simply because a defendant or a third-party
>
> settles or is dismissed from an action.
>
> * * *
>
> The jury may still assess the remaining defendants['] relative culpability
>
> and if the degree of fault attributable to one or more defendants is less than 25

percent, those defendants['] liability is several only. When they refer to - - in that language, which I think is Ditka [sic] - - the remaining defendants relative culpability, Mr. Yoder at one time was a defendant, he is no longer a defendant. Mr. Parker was once a defendant, he is no longer a defendant. As I stated before, I do not have any discretion. I do not have any power to ignore what the First District Appellate Court has told me."

Ferguson and Alexander argue that the trial court was incorrect and that *Blake* contains an incorrect reading of section 2-1117. The purpose of section 2-1117 is to provide protection, or minimum liability for defendants that are minimally responsible for the harm. *Unzicker*, 203 Ill. 2d at 78. As such, the defendants seize on the use of "total fault" and "relative culpability" in the statute and the fact that the *Lannom* court highlighted this language in discussing the issue where only one defendant remained in the cause of action. *Lannom*, 158 Ill. 2d at 542-43.

Ferguson and Alexander continue to argue that the bulk of state and federal cases that address this issue argues for the inclusion of settling defendants on the jury verdict forms. See *Alvarez v. Fred Hintze Construction*, 247 Ill. App. 3d 811, 818 (1993) (section 2-1117 cannot be negated because another tortfeasor has settled and jury should still assess the defendant's relative culpability); *Banovz v. Rantanen*, 271 Ill. App. 3d 910 (1995) (right to apportionment withstands good-faith settlement and settlors must be included to determine "total fault"); *Dowe v. National R.R. Passenger Corp.*, 01 C 5808, slip op. at 25-34 (N.D. Ill. April 26, 2004) (only consistent interpretation of cases like *Lannom* and the statute is to include settling defendants on allocation form as "defendants sued by the plaintiff" and "third party defendants who could have been

sued"); *Skaggs v. Senior Services of Central Illinois, Inc.*, 355 Ill. App. 3d 1120, 1127-29 (2005) ("sued by the defendant" is key phrase in the statute and it was proper to include a dismissed settling defendant on the fault allocation form). Ferguson and Alexander argue that these cases show that *Blake* was incorrectly decided and should not be followed.

Ferguson and Alexander claim that, even if *Blake* was a sound decision, the trial court erred in interpreting that *Lombardo* adopted the *Blake* holding. The key language from *Lombardo* cited by both defendants states:

> "Accordingly, inclusion of nonparties and settling defendants on the verdict form helps protect the plaintiff's right to an appropriate attribution of his own fault, as well as protecting the defendants' interests in their right to contribution. *Lilly* and *Blake* establish guidelines for using the attributions of fault for purposes of determining whether the defendants meet the 25% threshold of responsibility requisite for joint liability. Even though the court should include the bank and other settling defendants on the verdict form, it should consider the fault of only those parties specified in section 2-1117 for purposes of determining joint liability. Following *Blake*, the court should not subject the settling defendants to the expense of discovery, although the parties remain free to present any available evidence concerning the fault of the nonparties." *Lombardo*, 315 Ill. App. 3d at 125.

The defendants argue that this plainly contemplates and requires inclusion of settling defendants on the verdict form. They assert that if *Blake* had been adopted, the *Lombardo* court would have

reversed the finding of the trial court because the verdict forms included settling defendants. They highlight the court's statement that the defendant does not lose its right to contribution and is free to present any evidence concerning fault, but under *Blake*, a settling defendant is not required to undertake costly discovery. They continue to argue that, even if *dicta* as claimed by the trial court, *Lannom*'s discussion of section 2-1117 is judicial *dicta* and controlling on inferior courts. *People v. Williams*, 204 Ill. 2d 191, 207 (2003).

Following briefing on this case, this court issued an opinion discussing section 2-1117 in *Ready v. United/Goedecke Services, Inc.*, 367 Ill. App. 3d 272 (2006), *appeal allowed*, 222 Ill. 2d 600 (2006). In *Ready*, the plaintiff's estate filed suit against the decedent's employer, general contractor and scaffolding company for an accident that killed the decedent. The plaintiff settled with the employer and general contractor before trial. The remaining defendant filed a motion *in limine* to have all three original defendants included on the verdict form that was denied based on the trial court's finding that section 2-1117 excluded settling defendants. The estate prevailed at trial and the damage award was reduced by a setoff from the settlements and Ready's contributory negligence. *Ready*, 367 Ill. App. 3d at 273-75.

The *Ready* court reversed and remanded the case based on its interpretation of *Lannom*, *Dowe*, and *Skaggs*. The court highlighted the language in *Lannom* that the dismissal of a settling defendant from a case does not affect a nonsettling defendant's rights under settling 2-1117. The court opined it followed that settling defendants must be included on the verdict form so as not to affect the rights of nonsettling defendants. The *Dowe* court admitted that it did not lightly contradict its superior court's construction of Illinois law in *Freislinger*, but highlighted its

primary responsibility was to what the Illinois Supreme Court would determine. *Dowe*, slip op. at 25-29. The court stated that while both approaches to section 2-1117 gave meaning to the language to the statute, it found that *Lannom* and *Alvarez* provided the approach that was more faithful to the *Unzicker* court's conclusion that the legislature clearly intended that minimally responsible defendants should not have to pay entire awards. It added that the Seventh Circuit is not infallible in its predictions of what the Illinois Supreme Court will rule on an issue and that Judge Kocoras had properly found that *Freislinger* was incorrectly decided. *Dowe*, slip op. at 27, citing *Costello v. United States*, No. 96 C 187, slip op. at 8-10 (N.D. Ill. June 23, 1998).

The *Ready* court agreed with the finding in *Dowe* that the only way that minimally culpable defendants can be held minimally responsible as required by section 2-1117 is to allow the jury to assess the culpability of all defendants relative to each other. *Ready*, 367 Ill. App. 3d at 278. The *Ready* court concluded that "[f]ault is to be apportioned among all defendants sued by the plaintiff. Any settlement plaintiff enters into with any defendant should not serve to alter the remaining defendant(s)' degree of fault." *Ready*, 367 Ill. App. 3d at 279. The defendants argue that this line of cases properly interprets section 2-1117 and should be followed to support reversal of the jury verdict.

Jerelyn maintains that the plain language of section 2-1117 clearly indicates that settling defendants are not to be included on the fault allocation form. Jerelyn highlights that there is no modifier to the phrase "defendants sued by the plaintiff." 735 ILCS 5/2-1117 (West 1994). As settling defendants Rezetko and Scott were dismissed from the case after their settlements were found in good faith and accepted by the trial court, they were no longer defendants. Jerelyn

argues that logic dictates they also were no longer considered defendants sued by the plaintiff under the statute and to read that into the statute "would be a gross contortion of the legislative intent." *Blake*, 273 Ill. App. 3d at 376.

Jerelyn notes that this is how the *Lannom* and *Blake* courts and the Seventh Circuit interpreted the statute. *Lannom*, 158 Ill. 2d at 543 (jury may still assess the "remaining defendants' relative culpability); *Blake*, 273 Ill. App. 3d at 376; *Freislinger v. EMRO Propane Co.*, 99 F.3d 1412, 1419 (7th Cir. 1996) ("defendants sued by the plaintiff' means only those who remain in the case when it is submitted to the fact finder"). Jerelyn continues to argue that the legislature did not amend the statute in light of these opinions. When the legislature did amend the statute in 2003, its modifications did not affect the *Blake* decision, but responded to the *Unzicker* opinion finding that a plaintiff's employer should be included on the verdict allocation form. *Unzicker*, 203 Ill. 2d at 77. Jerelyn asserts that this is further support for the *Blake* court's conclusions as the legislature is presumed to have been aware of judicial decisions interpreting the statute in amending a statute. *Bruso v. Alexian Brothers Hospital*, 178 Ill. 2d 445, 458 (1997).

Jerelyn argues that Ferguson's and Alexander's reliance on *Ready*, *Dowe* and *Skaggs* is misplaced. Jerelyn asserts that *Dowe* is a federal district court opinion on a motion *in limine* that directly contradicts the Seventh Circuit's interpretation of section 2-1117 in *Freislinger*. Therefore, she argues, the opinion has no authority. Jerelyn points out that the *Skaggs* court did not discuss *Lannom*, *Blake*, or *Freislinger* and the legislature's failure to amend the statute following *Blake*. Likewise, Jerelyn argues that *Ready* also failed to discuss the amended statute and, accordingly, improperly interpreted the statute.

Jerelyn also argues that public policy favors following this interpretation of section 2-1117. She asserts that if it was not followed it would reduce settlements, which are favored by public policy. She claims that plaintiffs would be faced with a Hobson's choice of foregoing settlement or taking on the "empty chair" defense of the good-faith settler during trial to show that the settler was not more at fault than the nonsettling defendants.

While our supreme court has taken the appeal of *Ready* under advisement at this moment, we see no reason to further delay the decision in this case. It is obvious from the split of authority on this issue, and the detailed observation of divergent scenarios highlighted by Presiding Justice Hoffman's special concurrence in *Ready*, that section 2-1117 lacks absolute clarity and public policy may be supported by a decision either way. See *Ready*, 367 Ill. App. 3d at 281-82 (Hoffman, P.J., specially concurring). Accordingly, we do not find that the plain language of the statute supports either position in this case.

We find that the rule of statutory interpretation cited by Jerelyn as outlined in *Bruso* is central to this case. Even if we were to agree with the analysis provided by the *Ready* court, the decision in *Blake* found that settling defendants are no longer "defendants sued by the plaintiff" for purposes of section 2-1117. The legislature's subsequent amendment of the statute did not modify this language in response to established case law. We must presume that the legislature knew of the judicial decisions interpreting this language when it revised the statute. Accordingly, with its failure to clarify or modify this language at the time, we must presume it agreed with the *Blake* interpretation and cannot read the statute as defendants argue. Accordingly, the trial court properly followed the *Lombardo* and *Blake* decisions in limiting the fault allocation forms to the

remaining defendants.

### 2. *Fault Allocation Exclusion, Equal Protection and Due Process*

Ferguson next contends that the trial court's ruling on this issue violated his rights to equal protection and due process guaranteed by the state and federal constitutions. Where no fundamental right or suspect classification is involved, as in this case, a statute does not violate equal protection if it has a rational relationship to a legitimate state interest and is neither arbitrary nor discriminatory. *People v. Donoho*, 204 Ill. 2d 159, 177 (2003). Likewise, a due process challenge that does not involve a fundamental right must show the statute does not bear a rational relationship to a legitimate state interest. *In re R.C.*, 195 Ill. 2d 291, 302 (2001). Statutes enjoy a strong presumption of constitutionality, and the party alleging the infirmity carries the burden of proving the statute is unconstitutional. *Donoho*, 204 Ill. 2d at 177. The same analysis is applied to equal protection issues under both the constitutions of Illinois and the United States and review is *de novo. Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 323 (1996).

Ferguson admits that *Unzicker* has properly expressed a legitimate state interest behind section 2-1117, namely, that minimally responsible defendants, set at less than 25%, should not have to pay entire damage awards. *Unzicker*, 203 Ill. 2d at 78. However, Ferguson argues that the trial court's ruling in this case improperly created two different classes of defendants, those whose fault is measured against the total fault of all tortfeasors and those measured only against nonsettling tortfeasors. Accordingly, Ferguson states that a defendant may be deemed 15% at fault with all tortfeasors considered, but 75% at fault if the highest at-fault defendant settles and is removed from the equation.

Nos. 1-04-3214, 1-04-3230 (Cons.)

Ferguson asserts that this discrimination is particularly invidious because only the plaintiff may decide what party, or parties, to settle with. Furthermore, he argues that the availability or possibility of a settlement credit does not cure this problem. Ferguson highlights Scott's $469,000 settlement with Jerelyn and the jury in his case finding he was at least 51% responsible in a case that rendered a $38.3 million damage award for Jerelyn. Ferguson continues to assert that this also violates due process because the huge judgment was rendered against him while he was deprived of meaningful protection under section 2-1117.

Jerelyn argues that Ferguson waived this issue under the well-established rule that a party must object to an alleged constitutional violation at the earliest fair opportunity. *Chicago-Sandoval Coal Co. v. Industrial Comm'n*, 301 Ill. 389, 392 (1922). Jerelyn asserts that the issue of the verdict forms was decided prior to trial and Ferguson had every opportunity to raise the constitutional issues at that time. Because Ferguson does not provide a valid reason for waiting until his posttrial motion, Jerelyn concludes this issue was waived.

Alternatively, Jerelyn argues that neither the statute nor the trial court's decision violates equal protection or due process. She argues that Ferguson fails to properly identify the government interest, or errantly assumes that there is only one state interest, in support of the statute. Jerelyn highlights the important public policy favoring settlement as a means of resolving civil disputes as an additional state interest. *Rakowski v. Lucente*, 104 Ill. 2d 317, 325 (1984). Jerelyn argues that the classification created by section 2-1117 is rationally related to this goal because it encourages settlement by both plaintiff and defendant. Likewise, she argues that it supports the interest stated in *Unzicker* by removing one or more parties and their associated

settlement funds from the total damage award remaining defendants may have to pay.

Substantive due process prohibits pervasive restrictions on a person's life, liberty or property interest (*People v. R.G.*, 131 Ill. 2d 328, 342 (1989)), while substantive due process examines the procedures that might deny those rights. *East St. Louis Federation of Teachers, Local 1220 v. East St. Louis School District No. 189 Financial Oversight Panel*, 178 Ill. 2d 399, 415 (1997). Jerelyn states that a defendant has no protectable property in the allocation of fault to settling parties. *Snoddy v. Teepak, Inc.*, 198 Ill. App. 3d 966, 971 (1990). Accordingly, Jerelyn concludes there can be no violation of substantive or procedural due process.

After conceding not raising the issue until after trial, Ferguson asserts that Jerelyn fully briefed this issue on the merits in response to his posttrial motion and the trial court ruled on the merits. Ferguson certainly had the opportunity to argue that section 2-1117 was unconstitutional during pretrial proceedings and the jury instruction conference. However, Ferguson's argument rests largely on the result of the trial court's decision as applied in this case. He argues that there is a difference between raising a new issue on appeal and properly making additional arguments in support of an issue raised before the trial court.

The trial court had an opportunity to consider this issue after the distinction created by the statute had been applied to this case and rejected the argument. Although the issue was not waived, the rational basis test is a minimal standard and Ferguson cannot overcome the strong presumption of constitutionality. Either ground asserted by Jerelyn is a sufficient public policy interest rationally related to the classifications under section 2-1117 for purposes of both equal protection and due process. Removing settling parties from the fault allocation calculus while

retaining setoff rights and the joint liability limit clearly supports the promotion of settlements. This also reduces the amount of damages a minimally responsible party may have to pay. As we have affirmed the trial court's ruling on the fault allocation form and upheld the constitutional challenge, we do not need to consider defendants' claim that the finding of fault in Scott's case is *res judicata* on remand.

C. IPI Civil (2000) Nos. 12.04 and 12.05

Ferguson and Alexander assert that the trial court erred in forcing them to choose either IPI Civil (2000) Nos. 12.04 or 12.05 instead of giving both instructions as requested. "A particular jury instruction given by the trial court is proper if it is sufficiently clear, fairly and correctly states the law, and is supported by some evidence in the record." *Rios v. City of Chicago*, 331 Ill. App. 3d. 763, 776 (2002). In determining whether jury instructions were inadequate, this court will remand for a new trial only if the trial court clearly abused its discretion and a party's right to a fair trial has been shown from the failure to give an instruction. *Thompson v. Abbott Laboratories*, 193 Ill. App. 3d 188, 200 (1990). Likewise, the trial court's determination as to what issues are raised by the evidence will be disturbed only if the court abused its discretion. *Bryant v. LaGrange Memorial Hospital*, 345 Ill. App. 3d 565, 573 (2003).

IPI Civil (2000) No. 12.04 reads in full:

"More than one person may be to blame for causing an injury. If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.

-38-

[However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant.]"

IPI Civil No. 12.05 reads in full:

"If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury.

[However, if you decide that the sole proximate cause of injury to the plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant.]"

The notes for each of these instructions indicate the second paragraph in each instruction should be used only where there is evidence tending to show the sole proximate cause of the occurrence was a third person for IPI Civil (2000) No. 12.04, or something other than the conduct of the defendant for IPI Civil (2000) No. 12.05. IPI Civil (2000) Nos. 12.04, 12.05, Notes on Use, at 57, 58. In denying the request for both instructions, the trial court did not give specific reasons for its decision. The parties speculate on what its basis was for having the defendants choose and then only giving the short form of IPI Civil (2000) No. 12.04.

Ferguson and Alexander claim that the trial court's decision indicated that it believed there was sufficient evidence to support either instruction, but that defendants could argue only one sole proximate cause. Ferguson first asserts that weather has been accepted by Illinois courts as a proximate cause and not just a condition. *Heep v. Mason*, 100 Ill. App. 2d 142, 146-47 (1968).

Although *Heep* holds that whether the weather conditions are such that they are not a mere condition is fact-dependent, Ferguson asserts that the testimony of all witnesses showed that the weather changed suddenly and dangerously and the jury could have found it to be the sole proximate cause. Ferguson continues to argue that this is sufficient to support both instructions because it is permissible to have instructions to address alternative, inconsistent statements. *People v. Davis*, 213 Ill. 2d 459, 478 (2004). Accordingly, he concludes that the trial court abused its discretion in ignoring the extensive testimony supporting the request for both IPI Civil (2000) Nos. 12.04 and 12.05.

Jerelyn believes that Ferguson and Alexander hastily conclude that the trial court had determined there was sufficient evidence for either instruction. Jerelyn argues that if that were the case, the trial court erred because any finding that the weather was the sole proximate cause would be against the manifest weight of the evidence. Jerelyn admits there was evidence that the storm arose suddenly, but concludes the evidence that several vehicles were able to stop without harm fully contradicts the conclusion that weather was the sole proximate cause.

Jerelyn claims that our supreme court has made it clear that the sole proximate cause instruction should only be used when there is evidence showing the conduct of a third person was the sole proximate cause. *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 134 (1997); *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 121 (1986). Therefore, Jerelyn asserts that the trial court correctly gave only the first paragraph of IPI Civil (2000) No. 12.04. Jerelyn continues to claim that a sole proximate cause instruction may only be given when a party makes that exclusive

argument. *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 388 (2003). In this case, Jerelyn notes that the defendants argued that there were several possible causes, certainly not a sole proximate cause.

Jerelyn adds that the trial court agreed to submit the special interrogatory to the jury to determine if Scott was the sole proximate cause of injuries. Finally, Jerelyn argues that Illinois law has held that poor weather conditions are not a valid excuse for one's failure to control a vehicle. *Bouhl v. Smith*, 130 Ill. App. 3d 1067, 1070 (1985). Therefore, Jerelyn concludes, as a matter of law, the trial court did not err in not giving the sole proximate cause instruction with respect to the weather.

The element of proximate cause is an element of the plaintiff's case and the plaintiff bears the burden of proving the defendant's conduct was a proximate cause. A defendant's denial is sufficient to raise the sole proximate cause issue. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 520-21 (2000). The defendant may endeavor to prove a third party or some other cause is the sole proximate cause and tender jury instructions on that theory if supported by some competent evidence. *McDonnell*, 192 Ill. 2d at 521. The *McDonnell* court further noted that *Holton*, relied on by Jerelyn, was premised on the complete absence of evidence and argument on a sole proximate cause. *McDonnell*, 192 Ill. 2d at 521-22. Similarly, the *Ballweg* court denied a sole proximate cause instruction based on a complete lack of evidence in support of the instruction. *Ballweg*, 114 Ill. 2d at 121.

In *Ellig v. Delnor Community Hospital*, 237 Ill. App. 3d 396 (1992), the Second District

of this court found the trial court's refusal of the long forms of both IPI Civil 2d Nos. 12.04 and 12.05 was prejudicial error requiring a new trial. *Ellig* involved a medical malpractice action for the death of an undiagnosed twin baby. Sufficient evidence was presented to support instructions that a third-party doctor was the sole proximate cause and that the condition of the baby was the sole proximate cause. *Ellig*, 237 Ill. App. 3d at 408-09. The trial court rejected the long form of each instruction and gave only the short form of each. The *Ellig* court stated that by the trial court's refusal to give the sole proximate cause paragraphs for each instruction, it effectively decided that neither the third party nor the child's illness was the sole proximate causes. These were questions for the jury and the sole proximate cause paragraphs were required " 'in order to correct any negative implications arising from the first paragraph' " and the failure to give them constituted prejudicial error. *Ellig*, 237 Ill. App. 3d at 408, quoting *Miyatovich v. Chicago Transit Authority*, 112 Ill. App. 2d 437, 443 (1969).

In this case, although some vehicles were not able to stop without harm, there was repeated testimony about the time available to the drivers involved to stop despite the whiteout and icy road. A defendant may offer different theories of defense and have the jury instructed on them if evidence and argument are provided to support the theory. However, it is within the trial court's discretion to determine if sufficient evidence was presented to give an instruction. Based on the vast amount of evidence presented, we cannot say the trial court erred in failing to give the long forms of IPI Civil (2000) Nos. 12.04 and 12.05 because the evidence did not indicate there was a sole proximate cause to the accident.

We note that the evidence also does not support the trial court's decision to allow defendants to pick between IPI Civil (2000) Nos. 12.04 and 12.05. However, the trial court did give the proper instruction to the jury such that it was fairly, fully, and comprehensively apprised of the applicable legal principles. Accordingly, defendants have not demonstrated they suffered serious prejudice to their right to a fair trial and reversal is not warranted.

### D. Evidentiary Issues

Alexander and Ferguson also raise several evidentiary issues from trial. A challenge made to the trial court's ruling on the admissibility of evidence is reviewed under an abuse of discretion standard. *Mulloy v. American Eagle Airlines, Inc.*, 358 Ill. App. 3d 706, 711 (2005). The trial court is vested with the discretion to determine the relevance and admissibility of this evidence regardless of whether it is expert or lay testimony. *Mulloy*, 358 Ill. App. 3d at 711-12. A trial court abuses its discretion only when no reasonable person would agree with the trial court. *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003).

Alexander and Ferguson advance three separate evidentiary issues, which will be discussed together in this section. They argue that these errors, either alone or in combination, prejudiced them. Accordingly, they assert that a new trial is warranted to cure the errors.

### 1. *Redacting Portions of Jerelyn's Statement to Paramedics*

The trial court allowed Jerelyn's statement to paramedic Richmond in as an excited utterance. However, it held that her use of "son-of-a-bitch" was derogatory to Scott and would possibly distract the jury and ruled that the term was not allowed in opening statements. The trial

court stated that it would allow the parties to ask Richmond if Jerelyn was angry when she said "I told him to slow down." The trial court also stated that it would allow *voir dire* of Richmond at trial to determine whether Jerelyn was angry and whether that term was necessary to understand the urgency of her statement. Both defendants contend that the trial court erred in redacting the portion of Jerelyn's statement as it was central to their theory of the case and consistent with the totality of the evidence. *Spencer v. Wandolowski*, 264 Ill. App. 3d 611, 619 (1994).

Ferguson argues that the statement should have been admitted as an excited utterance in its entirety. Ferguson asserts that the rule of completeness permits a party to introduce the balance of a statement in order to fully explain a portion of the statement originally introduced by the opposing party. *Lawson v. G.D. Searle & Co.*, 64 Ill. 2d 543, 556 (1976). In order to apply the completeness doctrine, the remainder of the statement must concern the same subject at the same time and be relevant and material. *People v. Patterson*, 154 Ill. 2d 414, 453-54 (1992).

Ferguson and Alexander argue that Jerelyn's use of a derogatory term is precisely why the term is relevant and the trial court abused its discretion. They assert that allowing the full statement would put it in the proper context and reflect her anger and frustration with Scott's improper driving. They claim that the full statement was an indictment of Scott's driving while the redacted statement was simply an innocuous suggestion, which was an improper characterization of her statement.

They continue to argue that Jerelyn opened the door to the evidence in her closing arguments that they failed to provide a context of urgency to Jerelyn's statement. They argue that

the redaction allowed the jury to make the inference that Scott was not driving dangerously fast. They assert that the jury's finding in Scott's case that he was at least 51% at fault is proof that Scott was driving too fast and Jerelyn called him a "son-of-a-bitch" because of that fact. Further, they argue that if the jury had heard the statement in its entirety, it could have concluded that Scott was the sole proximate cause of the accident, exonerating the other defendants. Therefore, they conclude that this erroneous exclusion of evidence affected the allocation of fault and a new trial is required to remedy the error. *Hiscott v. Peters*, 324 Ill. App. 3d 114, 124 (2001).

Jerelyn begins her argument by noting that this court may affirm the decision of the trial court based on any reason appearing in the record, regardless of the trial court's basis. *Goldberg v. Michael*, 328 Ill. App. 3d 593, 597 (2002). Jerelyn then proceeds to restate the arguments she advanced to the trial court in her motion *in limine*. In her motion, Jerelyn argued that the statement should have been barred in its entirety as ambiguous, speculative, impermissible hearsay, made while Jerelyn was delirious, violative of the marital privilege, and likely to inflame or mislead the jury.

This issue may be resolved by considering the trial court's stated grounds for rejecting defendants' arguments. As noted above, the introduction of evidence is a matter of discretion for the trial court. It is within the discretion of the trial court whether or not to apply the rule of completeness. *Herron v. Anderson*, 254 Ill. App. 3d 365, 375 (1993). The trial court may exclude evidence where possible confusion or prejudice would result and outweigh the probative value. *Shaheed v. Chicago Transit Authority*, 137 Ill. App. 3d 352, 358 (1985); *Koonce v.*

*Pacilio*, 307 Ill. App. 3d 449, 463 (1999).

First, the rule of completeness does not require the inclusion of the full statement in this case. The trial court maintains discretion in the application of the doctrine, and the confusion or prejudice of a comment may still outweigh its probative value in completing a statement. The doctrine was created for situations where an opposing party introduces the original statement. Jerelyn had successfully moved to redact a portion of the statement and defendants still introduced Richmond's testimony. If the trial court's ruling on the motion *in limine* was proper, they cannot now complete an end run around the ruling because they were unable to show any urgency by Jerelyn.

As noted by Jerelyn, the trial court in this case "split the baby" by allowing the introduction of Jerelyn's hearsay statement to Richmond, but without the derogatory language. While it could be argued the trial court should have barred the entire statement, the trial court did not abuse its discretion in following this course of action. The trial court specifically granted the parties the ability to inquire into the setting and Richmond's sense of Jerelyn's demeanor and urgency in making the comment. The trial court further conducted *voir dire* to ascertain the full situation. Contrary to Ferguson's and Alexander's claims, Jerelyn's choice of language does not undisputably prove Scott's actions were as improper as they allege. It cannot be argued that the use of "son-of-a-bitch" was not derogatory toward Scott. The trial court properly exercised its discretion in barring that term and additional opportunities to elicit the level of Jerelyn's urgency.

2. *Barring Alexander's Testimony to the Speed of the Yoder Vehicle*

Alexander argues that the trial court erred in barring him from testifying that part of the basis for his estimate of Yoder's speed was the damage suffered by their vehicle in the crash. Alexander claims that this error was then compounded by the trial court's allowing Jerelyn to cross-examine him on his statement that the crash was the primary basis for his estimate and repeatedly instructing the jury that the physical condition of a vehicle cannot be used to determine the speed of the vehicle. Alexander argues that this served to discredit his testimony and, citing common sense and *Relli v. Leverenz*, 23 Ill. App. 3d 718, 721 (1974), argues the trial court improperly rejected his use of evidence to form proper inferences about the Yoder's speed.

Jerelyn responds that it is well settled that any person of ordinary ability and intelligence is competent to testify to the rate of speed of a moving object based simply on observation. Jerelyn asserts that it is equally well settled that one cannot testify to the rate of speed of a moving object based solely on the resulting damage, absent special training or knowledge. Citing *Collier v. Avis Rent A Car System, Inc.*, 248 Ill. App. 3d 1088 (1993); *Dauksch v. Chamness*, 11 Ill. App. 3d 346 (1973). In *Collier*, a state trooper with 16 years' experience in investigating accidents testified that he arrived on the scene after the accident and opined as to the speed and point of impact in the accident at issue. However, the trooper was not an accident reconstructionist, not qualified as an expert, and had not based his opinion on any scientific knowledge or training. Therefore, admission of that testimony was improper. *Collier*, 248 Ill. App. 3d at 1100-01. Alexander did not offer additional argument on this issue in his reply brief.

As argued in the parties' motions *in limine* on this subject, a lay witness may offer an

opinion on an issue where a person in general is accustomed and capable of making, comprehending, and understanding. *People v. Burton*, 6 Ill. App. 3d 879, 886 (1972). As explained in *Burton*, this recognized exception allows a nonexpert to testify "to the size, weight, color, and value of property, and to time, distance, speed, and the like." *Burton*, 6 Ill. App. 3d at 886. Accordingly, the parties concluded that Alexander could not offer his opinion of the speed of the Yoder vehicle based on the damage sustained.

Based on this, the trial court did not abuse its discretion in accepting the argument that Alexander had no expertise, training or specialized knowledge to support a speed estimate based on damage to the vehicle. As argued by Scott and Alexander, and allowed by the trial court, Alexander could testify as to Scott's speed based on his observations. However, he did not utilize any specialized knowledge to base his estimate on the damage sustained. The case cited by Alexander, *Relli*, stands simply for the principle that an inference as to speed may be allowed from the result of impact. However, the *Relli* case involved a question over the right-of-way statute and which party entered the intersection first, not an expert opinion on the speed of the vehicle based on principles out of the ken of an ordinary person. *Relli*, 23 Ill. App. 3d at 719-21.

Alexander testified that he watched the Yoder vehicle approach the accident scene, but temporarily lost sight of it while he turned around before impact. Alexander admitted that his deposition testimony stated that his speed estimation was a rough guess based partly on his observation of the vehicle's travel, but primarily on the damage at impact. Barring this testimony, but allowing Jerelyn to cross-examine Alexander on this issue also was proper. No evidence or

testimony was provided to support Alexander's ability to make this type of estimate and allowing Jerelyn to call his estimate into question was not improper. This is especially evident given the testimony of several witnesses that estimated the speed of the Yoder vehicle anywhere from 30 to 46 miles per hour.

### 3. *Allowing Reconstruction Expert Testimony by Wiechel*

Alexander asserts that the court abused its discretion by allowing Jerelyn to cross-examine Knoll's liability expert John Wiechel on opinions that were not disclosed in discovery pursuant to Supreme Court Rule 213(g) (Official Reports Advance Sheet No. 26 (December 20, 2006), R. 213(g), eff. January 1, 2007).[2] Alexander asserts that the trial court erred in overruling his objection to Wiechel's testimony at trial. Alexander argues that Rule 213 requires strict compliance under *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004), and the trial court's error was an abuse of discretion.

Alexander argues that Wiechel never disclosed an opinion concerning the exact point in time the Alexander vehicle came to rest, only that it crossed the end of the bridge before Alder. Alexander notes that no additional opinion was disclosed regarding the positions of those two vehicles after they had crossed the bridge, including where Alexander was when Alder and Knoll collided. However, Wiechel's cross-examination testimony contradicted Alexander's testimony that Alder was in front of him and moving from the left lane to the median.

---

[2] The current version of Rule 213(g) remains the same as the version in effect at the time of trial.

Alexander objected to this line of questioning based on a lack of disclosure. The trial court responded, "213, cross[-]examination. Overruled." The trial court further stated that opinions could come in on cross-examination based on the amended Rule 213. Alexander argues on appeal that, as Wiechel was codefendant Knoll's witness, Jerelyn was aligned with any testimony critical to the defense of other defendants. Therefore, he concludes, strict compliance with Rule 213 under *Sullivan* required barring Jerelyn from eliciting undisclosed opinions regarding the events as testified to by Alexander.

Jerelyn argues that Alexander's argument is meritless. Jerelyn asserts that Wiechel's testimony was disclosed, the cross-examination rule under Rule 213(g) applies in any event, and that this argument was waived for failing to raise the specific basis relied upon for appeal. First, Jerelyn notes that, in his Rule 213(f)(3) interrogatory responses and an additional summary conclusion, Wiechel disclosed opinions and measurements of various vehicles involved in the accident, including Alexander, Alder and Knoll, and the opinion on the accident sequence that had Alexander crossing the bridge before Alder and Knoll. Jerelyn asserts that her question was a logical elaboration on the disclosed information.

Jerelyn next argues that the exception to the cross-examination rule highlighted in the committee comments of Rule 213 does not apply in this situation. See, 210 Ill. 2d R. 213(g), Committee Comments. Jerelyn asserts that Alexander has not shown how Jerelyn and Knoll were aligned to trigger this exception. Jerelyn argues that the only fact asserted by Alexander is that each defendant had filed contribution claims against each other. Jerelyn concludes that this is not

relevant to the issue of liability or any alignment between her and Knoll.

Finally, Jerelyn argues that Alexander waived this argument for failing to raise the exception to the cross-examination rule based on the alignment of the parties at trial. *York v. El-Ganzouri*, 353 Ill. App. 3d 1, 18 (2004). Jerelyn asserts that Alexander simply argued that Wiechel's opinion had not been disclosed and was improper. Alexander did not offer additional argument on this issue in his reply brief.

Assuming Alexander did not waive this issue, his argument fails on the other two grounds cited by Jerelyn. Wiechel's disclosures included opinions on the sequence of the accident. As noted above, the trial court barred certain opinions disclosed by Wiechel regarding Alexander's speed and other hypotheticals regarding the Yoder vehicle that were purely speculative. That bar did not include his opinions on the sequence of the vehicles. Wiechel elaborated on his sequence disclosures, which is allowed under the rule. *Foley v. Fletcher*, 361 Ill. App. 3d 39, 47 (2005). Wiechel was not asked specific timing questions and did not offer new reasons for his opinions. Accordingly, even if Jerelyn were considered Knoll's "coparty," no previously undisclosed contributory negligence opinions were elicited. Accordingly, the trial court did not abuse its discretion in allowing this examination of Wiechel.

### E. The Marshall Settlement and the Contribution Act

Ferguson argues in the alternative, and Alexander adopts his arguments in whole, that he has a vested property right in the contribution judgment against Marshall and the defendants are entitled by the Contribution Act to a setoff of the full amount of the judgment against Marshall.

This court conducts a *de novo* review of whether the Contribution Act authorizes diminishing the judgment against Marshall. *Unzicker*, 203 Ill. 2d at 74. Whether or not the trial court erred in making a good-faith determination is reviewed for an abuse of discretion. *Johnson v. United Airlines*, 203 Ill. 2d 121, 135 (2003).

Ferguson argues that the Contribution Act must be construed to protect the interests of the litigants. He asserts that they have a vested property right in the judgment for contribution against Marshall for $12,639,000 that cannot be unilaterally diminished by a party. *Smithberg v. Illinois Municipal Retirement Fund*, 192 Ill. 2d 291, 304 (2000); *In re Marriage of Nielsen*, 341 Ill. App. 3d 863, 868 (2003). He argues that the trial court impermissibly vacated that judgment in favor of Ferguson and Alexander when it approved Jerelyn's settlement with Marshall.

Ferguson notes that the Contribution Act serves two primary public policies - "the encouragement of settlements and the equitable apportionment of damages among tortfeasors." *Johnson*, 203 Ill. 2d at 133. The trial court must strike a balance between these policy considerations when deciding whether a settlement has been negotiated in good faith. *Johnson*, 203 Ill. 2d at 133. Ferguson argues that for postverdict settlements, the policy considerations favoring settlement no longer remain and the policy of ensuring equitable apportionment must be closely scrutinized to avoid improper shifting of liability. *Dick v. Gursoy*, 124 Ill. App. 3d 185, 189 (1984).

In *Dick*, the plaintiff brought survival and wrongful death claims against multiple defendants, coming to a tentative settlement agreement with all but one defendant before trial for

$260,000 in exchange for covenants not to sue. *Dick*, 124 Ill. App. 3d at 186. The jury awarded the plaintiff $100,000 for the wrongful death count and $200,000 for the survival count. *Dick*, 124 Ill. App. 3d at 186. The pretrial agreement was not final and did not differentiate between the wrongful death and the survival counts. Despite this, the trial court approved the settlement as an entire application of the $260,000 for the wrongful death action, requiring the defendant to pay the entire $200,000 award in the survival action. *Dick*, 124 Ill. App. 3d at 189. The Second District of this court reversed the trial court's denial of the defendant's motion for setoff because the result was a $460,000 total for plaintiff, $160,000 more than the total damage amount determined by the jury. The *Dick* court found that this violated the policies of protecting the interests of nonsettling parties and against double recovery and granted the setoff motion for the total of the settlement amount. *Dick*, 124 Ill. App. 3d at 189.

Ferguson cites to a series of cases to make the additional point that either the right of contribution or a setoff fairly reflecting readily ascertainable liability is required in this situation. *Stickler v. American Augers, Inc.*, 303 Ill. App. 3d 689 (1999) (*Stickler I*); *Stickler v. American Augers, Inc.*, 325 Ill. App. 3d 506 (2001) (*Stickler II*). In *Stickler*, the trial court found a settlement of wrongful death and survival claims to be in good faith. However, in *Stickler I*, this court reversed and remanded because the settlement released the employer from more than a million dollars in liability for future workers' compensation benefits. Although the plaintiff had every right to take the consideration up front, the remaining defendant was denied the right of contribution and a fair setoff. *Stickler I*, 303 Ill. App. 3d at 693.

In *Stickler II*, the trial court reapproved the settlement noting that the workers' compensation portion had been approved by the Industrial Commission. This court reversed and remanded the matter again, stating that the Industrial Commission served a different role from the court and was not charged with considering the Contribution Act. *Stickler II*, 325 Ill. App. 3d at 511-12. The matter was remanded for a determination of the settling defendants' liability before the settlement so the nonsettling defendant might receive a setoff fairly reflecting the settling party's liability. *Stickler II*, 325 Ill. App. 3d at 578-79. Ferguson argues that the trial court is authorized by the Contribution Act to allow a full setoff, notwithstanding the terms of the agreement and should have applied a full setoff in this case. See *Dubina v. Mesirow Realty Development, Inc.*, 197 Ill. 2d 185, 198 (2001) (Harrison, C.J., dissenting), citing 740 ILCS 100/2(c) (West 1994).

Jerelyn argues that *Dubina* provides that a right to contribution only exists for a defendant that has paid more than its *pro rata* share of damages and that is limited to any party that has not settled in good faith. *Dubina*, 197 Ill. 2d at 191. Because the trial court found the Marshall settlement to be in good faith, Jerelyn argues that dismissal of the claims against Marshall was required. As asserted in her argument with respect to the Scott and Rezetko settlements, the trial court has the discretion to find a settlement in good faith. In addition to all of the surrounding circumstances, the factors that have been considered by courts in making this determination are: (1) whether the amount paid is within a reasonable range of the settlor's fair share of liability; (2) whether the settling parties shared a close relationship; (3) whether the plaintiff sued the settlor;

and (4) whether a calculated effort was made to conceal the circumstances surrounding the settlement agreement. *Wreglesworth v. Arctco, Inc.*, 317 Ill. App. 3d 628, 634 (2000). Jerelyn argues that the settlement was properly found to be in good faith and the record supports this finding.

Jerelyn further argues that granting a setoff only for the Marshall settlement amount was not in error. Jerelyn asserts that our supreme court has squarely rejected Ferguson's argument that he is being forced to pay over his *pro rata* share of liability. *Henry v. St. John's Hospital*, 138 Ill. 2d 533 (1990); *Harshman v. DePhillips*, 218 Ill. 2d 482 (2006). In *Henry*, the plaintiff settled with one of two defendants after the jury had found the settling defendant 93% responsible for a $10 million damage award and the trial court found the settlement to be in good faith. *Henry*, 138 Ill. 2d at 536-38.

The defendants that were found to be 7% liable appealed the trial court's denial of their petition to enforce the judgment. Our supreme court affirmed the denial of their petition. The court reasoned that the nonsettling defendants were jointly liable for the judgment, minus the amount paid in the settlement. *Henry*, 138 Ill. 2d at 542-43. Jerelyn contends that *Harshman* also stands for this proposition requiring the jointly liable defendant to pay the remainder of the award as it upheld *Henry* and found that they may seek contribution if they pay more than their *pro rata* share. *Harshman*, 218 Ill. 2d at 497-500.

Marshall agrees with Jerelyn that their settlement was properly determined to be a good-faith settlement. Marshall points out that no evidence of bad faith or wrongdoing was presented

to show the settlement was improper. She notes that both sides presented evidence to the trial court to support the finding that the parties compromised to obtain certainty. The parties were able to avoid any appeal, Marshall avoided the continuing accrual of postjudgment interest and Jerelyn did not need to worry about her fear of certain weaknesses in her argument on appeal. Based on the record, it cannot be said the trial court abused its discretion in finding the settlement was in good faith.

However, Marshall agrees that Ferguson was entitled to a full setoff of her adjudicated pro rata share. Marshall notes that the *Stickler II* court importantly found that a plaintiff has every right to take a lump-sum payment, but this "choice comes with a price," because in doing so, "the plaintiff forfeits the ability to recover the entire balance of damages otherwise owed by the settling defendant from the nonsettling defendants." *Stickler II*, 325 Ill. App. 3d at 512.

We agree that *Henry* and *Harshman* are distinguishable. The key difference in those cases was that the nonsettling defendants failed to timely file a contribution claim. *Henry*, 138 Ill. 2d at 547; *Harshman*, 218 Ill. 2d at 489-504. In *Henry*, the nonsettling defendant during trial, and in *Harshman,* the nonsettling defendant, each filed a contribution claim in Cook County circuit court for a case that had been brought in federal district court. In each case, our supreme court acknowledged this fact as central to its decision to deny the desired remedy. *Henry*, 138 Ill. 2d at 548; *Harshman*, 218 Ill. 2d at 499-500. This case is entirely distinguishable because third-party contribution claims were filed as part of the action and were granted.

Ferguson, Alexander and Marshall make the compelling argument that the price Jerelyn

must pay for settling for $10,800,000 from Marshall instead of the $12,639,000 judgment is a setoff for the difference. Unlike *Henry* and *Harshman*, Ferguson and Alexander properly filed and received judgment on their contribution claims. The parties argue that the trial court entered contribution judgments for Ferguson and Alexander against Marshall. Serving the twin goals of the Contribution Act, the contribution judgment must be vacated. In addition, pursuant to section 2 of the Contribution Act, the trial court should have entered a setoff of the entire judgment against Marshall for Ferguson. Otherwise, as Marshall argues, there would be no incentive to settle and end litigation while parties would also have to pay over their adjudicated liability.

### F. The Scott and Rezetko Settlements

Alexander argues that pretrial maneuvering by Jerelyn resulted in reaching settlement agreements with Scott and Rezetko. Alexander asserts that the fact this excluded Scott and Rezetko from the final fault allocation demonstrates that those settlements were not made in good faith. As noted above, whether or not the trial court erred in making a good-faith determination is reviewed for an abuse of discretion. *Johnson*, 203 Ill. 2d at 135.

Alexander asserts that Scott and Rezetko were disproportionately at fault in the accident and yet were able to settle with Jerelyn for $469,000 and $270,000, respectively. Alexander argues that a settlement cannot be considered in good faith, as a matter of law, if it shifts a disproportionately large and inequitable amount of the damages on the shoulders of nonsettling defendants. *Associated Aviation Underwriters, Inc. v. Aon Corp.*, 344 Ill. App. 3d 163, 177 (2003); *Stickler II*, 325 Ill. App. 3d at 512. Alexander points to the jury's finding that Scott was

more than 51% at fault for his injuries and the fact that "no reasonable person can deny that Rezetko is more at fault than Marshall," whom the jury found 33% at fault. Accordingly, the settlement amounts of Scott and Rezetko, Alexander asserts, resulted in an unjust and inequitable apportionment such that they were not in good faith.

Furthermore, Scott, based on the equitable distribution of a high-low settlement agreement with Knoll, received $1.8 million in the case, despite the jury's verdict. Alexander argues that because of this, and Jerelyn's lack of objection to Scott's receipt of funds, the settlements do not satisfy the good-faith requirement. Alexander concludes that the two most responsible parties escaped paying their fair, *pro rata* share.

As indicated above, Jerelyn responded to this argument indicating that the factors to be considered in determining good faith outlined in *Wreglesworth* were met. Jerelyn notes that the issue of the settlements was fully briefed and argued before the trial court and the trial court issued reasoned, written orders finding each settlement in good faith. The trial court noted in its order finding Scott's settlement was in good faith, since it considered the "wide breadth of evidence" concerning Scott's speed at the time of the accident, the fact that Scott was offering the entirety of his $500,000 policy limit and the speculative nature of jury verdicts and awards.

Jerelyn argues that the defendants did not present evidence that the settling parties had acted in bad faith. Rather, Jerelyn asserts that the defendants relied on the level of consideration in comparison to the potential exposure of liability. Jerelyn also asserts that Alexander has simply advanced the same conclusory argument on appeal, that the two most responsible parties were

able to settle for vastly less than their proper share of the $38.3 million award. Jerelyn concludes that Alexander is simply relying on the "ratio test," a test that Illinois courts have repeatedly rejected as a basis for determining good faith. *Johnson v. Belleville Radiologists, Ltd.*, 221 Ill. App. 3d 100, 104 (1991).

Scott also cites the complete lack of evidence of any wrongdoing on behalf of the settling parties presented at trial or on appeal. Scott argues that *Solimini v. Thomas*, 293 Ill. App. 3d 430, 439-40 (1997), relied on by the trial court, argues that possible damages from a separate lawsuit are immaterial in considering if a settlement is in good faith. Scott also highlights that, unlike the cases discussed by Alexander, any liability or award in this case was purely speculative at the time of settlement. He adds that, based on the extensive evidence amassed during discovery, there were numerous questions as to the parties' culpability.

In the orders finding the settlements in good faith, the trial court clearly considered the ample evidence of the fault of Scott and Rezetko. The trial court also strongly considered the speculative nature of any jury's verdict and award, and that both Scott and Rezetko were offering the maximum amount that their insurance policies would allow. The ratio test is not a proper means of determining the good faith of a settlement, especially in hindsight, as the verdict and damages in this case were entirely speculative at the time of the trial court's finding. There was no evidence presented of improper behavior. The trial court noted that Scott could gain financially in his own case, but, pursuant to *Solimini*, this also was not a proper consideration in determining good faith. Accordingly, the trial court properly weighed the required factors and

found the settlements in good faith.

### G. Denial of Alexander's Motion for a Mistrial

Finally, Alexander argues that the trial court erred in denying his motion for a mistrial based on comments made by a juror regarding liability insurance. Alexander cites two cases in his argument, *Koonce v. Pacilio*, 307 Ill. App. 3d 449 (1999) and *Lenz v. Julian*, 276 Ill. App. 3d 66 (1995). Alexander did not offer additional argument on this issue in his reply brief. As Jerelyn argues, Alexander misstates the applicable facts, fails to develop any cogent argument on this issue and misapplies distinguishable case law. To warrant reversal, there must be more than a mere mention of insurance, but a mention directed toward the financial status of the defendant with undue emphasis resulting in prejudice. *Koonce*, 307 Ill. App. 3d at 456. In this case, a prospective juror made a general comment about insurance to no one in particular and not to the financial status about anyone involved. The trial court investigated the issue, questioning several prospective jurors, none of whom testified that they heard anything about insurance, and excused the prospective juror that made the comment. Nothing remotely close to meeting the requirements of *Koonce* is argued or of record and Alexander's argument on this issue must fail.

### III. CONCLUSION

Accordingly, for the aforementioned reasons, the decision of the trial court is affirmed in part. The trial court's refusal to grant defendants a full setoff for the judgment against Marshall is reversed.

Affirmed in part and reversed in part.

Nos. 1-04-3214, 1-04-3230 (Cons.)

O'BRIEN, J., concurs.

NEVILLE, P.J., dissents.

PRESIDING JUSTICE NEVILLE, dissenting:

I respectfully dissent. I believe the majority's reliance on <u>Lombardo v. Reliance Elevator Co.</u>, 315 Ill. App. 3d 111, 124-25 (2000), and <u>Blake v. Hy Ho Restaurant, Inc.</u>, 273 Ill. App. 3d 372 (1995), is misplaced. I also disagree with the majority's holding that a settling defendant's name should not be included in a verdict form submitted to a jury because the fault of a settling defendant is not considered when determining the fault of a nonsettling defendant. Slip op. at 27-35.

In order to understand my position, we need to examine section 2-1117 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1117 (West 1994)). Section 2-1117 of the Code provides:

"Except as provided in Section 2-1118, in actions on

account of bodily injury or death or physical damage to property,

based on negligence, or product liability based on strict tort liability,

all defendants found liable are jointly and severally liable for

plaintiff's past and future medical and medically related expenses.

Any defendant whose fault, as determined by the trier of fact, is less

than 25% of the total fault attributable to the plaintiff, *the*

> *defendants sued by the plaintiff*, and any third party defendant who
> could have been sued by the plaintiff, shall be severally liable for all
> other damages.  Any defendant whose fault, as determined by the
> trier of fact, is 25% or greater of the total fault attributable to the
> plaintiff, *the defendants sued by the plaintiff*, and any third party
> defendants who could have been sued by the plaintiff, shall be
> jointly and severally liable for all other damages." (Emphasis
> added.)  735 ILCS 5/2-1117 (West 1994).

First, I note that section 2-1117 directs the trier of fact to consider the "total fault" attributable to the plaintiff.  735 ILCS 5/2-1117 (West 1994). Second, I note that section 2-1117 directs the trier of fact to consider (a) the fault of "the defendant sued by the plaintiff," and (b) the fault of "any third party defendant who could have been sued by the plaintiff."  735 ILCS 5/2-1117 (West 1994). Finally, nowhere in section 2-1117 is the trier of fact directed not to consider the fault of settling defendants. 735 ILCS 5/2-1117 (West 1994).

The fact that a defendant has settled with the plaintiff does not change the fact that he or she was a party to the lawsuit.  I note that only misjoined parties may be dropped or stricken as parties to a lawsuit after the entry of a court order.  735 ILCS 5/2-407 (West 2002) ("parties misjoined may be dropped by order of the court, at any stage of the cause, before or after judgment, as the ends of justice may require and on terms which the court may fix").  Absent an order of court that identifies a defendant as having been misjoined and that authorizes the

dropping of that defendant, which did not occur in this case, " 'the rights of a nonsettling defendant under section 2-1117 "cannot be negated simply because another tortfeasor has settled with the plaintiff." ' " Ready v. United/Goedecke Services, Inc., 367 Ill. App. 3d 272, 278 (2006), quoting Alvarez v. Fred Hintze Construction, 247 Ill. App. 3d 811, 818 (1993), quoting E. Walsh & E. Doherty, Section 2-1117: Several Liability's Effect on Settlement and Contribution, 79 Ill. B.J. 122, 125 (1991).

In my opinion, the fact that a defendant has settled with the plaintiff does not change that defendant's status as a "defendant sued by the plaintiff" and should not be permitted to "alter the remaining defendant(s)' degree of fault" because that could cause the nonsettling defendants to experience a "double benefit." Ready, 367 Ill. App. 3d at 279. By "double benefit," Ready explains that " [a nonsettling defendant] would be able to 'levy fault to nonparties at trial' and, after trial, would receive the benefit of a reduction in the total judgment amount from [the settling defendant's] settlement [] with plaintiff." Ready, 367 Ill. App. 3d at 279.

In conclusion, because the plain language of section 2-1117 of the Code does not direct the trier of fact not to consider the fault of settling defendants (725 ILCS 5/2-1117 (West 1994)), I think the majority has misinterpreted the language in the statute. Therefore, I would reverse the trial court's decision in this case because I believe that section 2-1117 of the Code requires the settling and the nonsettling defendants' fault to be determined in the same verdict form so the jury can properly apportion their fault. Ready, 367 Ill. App. 3d at 278-79.